IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| EMERALD CITY MGMT., LLC, and EMERALD CITY BAND, INC. | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION No. 4:14-cv-358 |
| | § | Judge Mazzant |
| JORDAN KAHN and JORDAN KAHN MUSIC COMP., LLC, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| JORDAN KAHN | § | |
| | § | |
| *Third-Party Plaintiff/Counter-Plaintiff* | § | |
| | § | |
| v. | § | |
| | § | |
| DEAN "DENO" TAGLIOLI, EMERALD CITY BAND, INC., AND EMERALD CITY MGMT., LLC | § | |
| | § | |
| *Third-Party Defendant And Counter-Defendants* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Emerald City Band, Inc. ("EC Band Inc."), Emerald City Management, LLC ("EC Management LLC") (collectively "Emerald City"), and Dean Taglioli ("Taglioli") Motion for Summary Judgment (Dkt. #116), and Jordan Kahn ("Kahn"), and Jordan Kahn Music Comp., LLC ("JKMC") (collectively "Kahn & Co.") Motion for Summary Judgment (Dkt. #118). After reviewing the relevant pleadings, the Court finds that the motions should be granted in part and denied in part.

1

# BACKGROUND

Dean Taglioli is the sole member of EC Management LLC and the president of EC Band Inc. (Dkt. #127-3 at p. 1).  According to Emerald City, EC Band Inc. operates one cover band (Emerald City Band) and EC Management LLC operates three cover bands (Limelight, Party Makers, and Downtown Fever) (Dkt. #127-3 at p. 2).  These cover bands provide entertainment at special events and parties.

In 2007, while a student at Berklee College of Music in Boston, Jordan Kahn established a band that he called "Downtown Fever," which allegedly developed a strong following in the Boston area (Dkt. #88 at ¶¶ 8–10).  In 2008, Taglioli invited Downtown Fever to play during the break of an Emerald City performance at a Dallas club called Cape Buffalo (Dkt. #88 at ¶ 13; Dkt. #116-2 at 18:18–19:13).  This was the only time that Kahn's band Downtown Fever played in Texas prior to August 2009 (Dkt. #116-2 at 16:19–17:8).

Musician Jordan Kahn first began playing with Emerald City Band in 2004 and 2005, when he was living in Plano, Texas (Dkt. #88, at ¶ 10).  In 2009, Taglioli invited Kahn to leave Boston and affiliate with Emerald City.  Kahn began working with Taglioli in September 2009, and continued to lead Downtown Fever as part of his employment (Dkt. #88 at ¶ 14).  Kahn alleges that in September 2009, he gave Emerald City a license to use the mark DOWNTOWN FEVER (Dkt. #88 at ¶ 41).  Kahn's first performance with the Dallas-based Downtown Fever band was on October 10, 2009 (Dkt. #129-1 at 54:5–18).  In 2011, Emerald City applied for a Texas trademark for DOWNTOWN FEVER (Dkt. #127-3 at p. 8).  In doing so, it claimed that the first use of the DOWNTOWN FEVER mark was in 2005 (Dkt. #127-3 at p. 8).

The relationship between Taglioli and Kahn soured, and Kahn resigned on May 28, 2014 (Dkt. #81 at ¶ 17).  Emerald City later filed the present lawsuit, in which the parties are now

suing one another for trademark infringement, unfair competition, misappropriation of trade secrets, and several other causes of action.

According to Emerald City, Kahn engaged in the following behavior after he left the company:

- Kahn blocked Emerald City out of its Downtown Fever website and social media accounts (Dkt. #81 at ¶¶ 17, 24).
- Kahn directed web traffic from Emerald City's Downtown Fever website to a website that is almost an exact copy of Emerald City's, but which had Emerald City's contact number replaced with Kahn's contact number (Dkt. #81 at ¶¶ 17, 21).
- Kahn refused to return personal property to Emerald City (Dkt. #81 at ¶ 19).
- Kahn convinced customers under contract with Emerald City and potential Emerald City customers to use Kahn's Downtown Fever band rather than Emerald City's Downtown Fever band (Dkt. #81 at ¶¶ 20, 25).

Kahn claims that he was the original owner of the DOWNTOWN FEVER mark and the first to use the mark in commerce (Dkt. #88 at ¶¶ 8, 20). He also claims that he was the first to pay for and develop a Downtown Fever website (Dkt. #88 at ¶ 10). In addition to counterclaims alleging infringement and misappropriation of intellectual property, Kahn is also suing for fraud and misrepresentation, based on Taglioli's failure to provide the allegedly-promised 30% equity interest in EC Management LLC.

Emerald City is asserting the following claims: (1) trademark infringement, (2) false advertising/unfair competition, (3) dilution, (4) cybersquatting, (5) copyright infringement, (6) tortious interference (with existing contracts and prospective business relations), (7) misappropriation of trade secrets, (8) breach of fiduciary duty, (9) conversion/civil theft, (10) conspiracy, and (11) attorney's fees. Kahn is asserting the following claims against Taglioli and Emerald City: (1) trademark infringement, (2) unfair competition, (3) breach of licensing agreement, (4) fraudulent registration with the Texas Secretary of State, (5)

misrepresentation/fraud, (6) unjust enrichment, (7) promissory estoppel, (8) misappropriation of trade secrets, and (9) declaratory relief.

On August 21, 2015, Taglioli and Emerald City filed Counter-Defendants' and Third-Party Defendant's Motion for Partial Summary Judgment (Dkt. #116). On September 10, 2015, Kahn & Co. filed Defendants' Response to Counter-Defendants and Third-Party Defendant's Motion for Summary Judgment (Dkt. #129). On September 21, 2015, Taglioli and Emerald City filed Reply to Defendants' Response to Counter-Defendants and Third-Party Defendant's Motion for Partial Summary Judgment (Dkt. #130).

On August 21, 2015, Kahn & Co. filed Defendants' Motion for Summary Judgment (Dkt. #118). On September 10, 2015, Taglioli and Emerald City filed Plaintiff's Response to Defendants' Motion for Summary Judgment (Dkt. #127). On September 21, 2015, Kahn & Co. filed Defendants' Reply in Support of Their Motion for Summary Judgment (Dkt. #132). On October 1, 2015, Taglioli and Emerald City filed Counter-Plaintiff's Sur-Reply in Opposition to Counter-Defendants and Third-Party Defendant's Motion for Summary Judgment (Dkt. # 134).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey*

*Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257. No "mere denial of material facts nor…unsworn allegations [nor] arguments and assertions in briefs or legal memoranda" will suffice to carry this burden. *Moayedi v. Compaq Computer Corp.*, 98 F. App'x 335, 338 (5th Cir. 2004). Rather, the Court requires "significant probative evidence" from the nonmovant in order to dismiss a request for summary judgment supported appropriately by the movant. *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001). The Court must consider all of the evidence, but must refrain from making any credibility determinations or weighing the evidence. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

### Legal Background on Trademark Infringement and Unfair Competition

"The Texas common law elements of unfair competition, including trademark, 'are no different than those under federal trademark law.'" *Condom Sense, Inc.*, 390 S.W.3d at 738 (Tex. App.—Dallas 2012, no pet.) (quoting *All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 488 (Tex. App.—Fort Worth 1999, no pet.)). Because of this, Texas courts "look to the Lanham Act and cases thereunder for generally accepted principles of substantive trademark law and to discern meaning and interpretation of the state law provisions." *Condom Sense*, 390 S.W.3d at 738 (citing *KLN Steel Prods. Co. v. CNA Ins. Cos.*, 278 S.W.3d 429, 440–41 (Tex. App.—San Antonio 2008, pet. denied). To establish trademark infringement and unfair competition, the plaintiff must show ownership in a legally protectable mark and demonstrate a likelihood of confusion. *Smack Apparel*, 550 F.3d at 474.

"At common law, trademark ownership is acquired by actual use of the mark in a given market." *Emergency One, Inc. v. Am. Fire Eagle Engine Co., Inc.*, 332 F.3d 264, 267 (4th Cir. 2003). Such use must be uninterrupted and continuing. *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 762 (9th Cir. 2006); *see Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1265 (5th Cir. 1975) ("[A] single use in trade may sustain trademark rights if followed by continuous commercial utilization . . . ."). A user of a mark "acquires ownership of that mark within the geographic area in which he is currently using the mark." *Uptown Grill, LLC v. Shwartz*, No. CIV.A. 13-6560, 2015 WL 4223316, at *9 (E.D. La. July 10, 2015) (citing *Union Nat. Bank of Tex., Laredo, Tex. v. Union Nat. Bank of Tex., Austin, Tex.*, 909 F.2d 839, 843 (5th Cir. 1990)).

"[T]he existence of sales or lack thereof does not by itself determine whether a user of a mark has established ownership rights therein." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1196 (11th Cir. 2001). The Eleventh Circuit, for example, has recognized

trademark rights in computer software given away free of charge where widespread distribution "constitute[d] significant and substantial public exposure of a mark sufficient to have created an association in the mind of public." *Id*. at 1200.

Similarly, "[m]erely advertising a mark in a given territory is insufficient to establish use—advertisements must have the desired effect of penetrating the consumer market in that location." *Diamonds Direct USA, Inc. v. BFJ Holdings, Inc.*, 895 F. Supp. 2d 752, 759 (E.D. Va. 2012) (citing *Spartan Food Sys., Inc. v. HFS Corp.*, 813 F.2d 1279, 1283 (4th Cir. 1987)); *see New W. Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1200 (9th Cir. 1979) ("Although mere advertising by itself may not establish priority of use . . . [appellee's] promotions coupled with advertiser and distributor solicitations unquestionably meet the *Mendes* 'public identification' requirement."). On a motion to dismiss, one court held that sending out announcements to 13 million comic book readers and extensive advertisements in popular magazines were sufficient to establish commercial use of a trademark, absent any evidence of actual sales. *Marvel Comics Ltd. v. Defiant, a Div. of Enlightened Entm't Ltd.*, 837 F. Supp. 546, 549 (S.D.N.Y. 1993). But in another case, evidence of advertisements, attendance at trade shows, creation of prototypes, and e-mail blasts failed to raise a genuine issue of fact regarding use in commerce because there was no "evidence of how widespread these efforts were and how wide an audience they reached[.]" *Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 155 (S.D.N.Y. 2011), *aff'd*, 508 F. App'x. 31 (2d Cir. 2013) (internal citations omitted).

"Once a plaintiff shows ownership in a protectable trademark, he must next show that the defendant's use of the mark creates a likelihood of confusion in the minds of potential customers as to the source, affiliation, or sponsorship of the product at issue." *Smack Apparel*, 550 F.3d at 478 (quotation omitted). "'Likelihood of confusion' means more than a mere possibility; the

plaintiff must demonstrate a probability of confusion." *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009). In assessing whether a likelihood of confusion is present, courts look to eight so-called "digits of confusion":

1. the type of mark allegedly infringed,
2. the similarity between the two marks,
3. the similarity of the products or services,
4. the identity of the retail outlets and purchasers,
5. the identity of the advertising media used,
6. the defendant's intent,
7. any evidence of actual confusion, and
8. the degree of care exercised by potential purchasers.

*Id* at 227 (citation omitted). No single factor is dispositive, and the factors "may weigh differently from case to case, 'depending on the particular facts and circumstances involved.'" *Id*. (citing *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir.1985)). "Although the secondary meaning of a mark and the likelihood of confusion are ordinarily questions of fact . . . summary judgment may be upheld if the summary judgment record compels the conclusion that the movant is entitled to judgment as a matter of law." *Smack Apparel*, 550 F.3d at 474.

The Fifth Circuit has held that a district court is not required to consider all of the digits of confusion when the marks are identical. *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 311 (5th Cir. 2008). The Fifth Circuit has not held that a likelihood of confusion is assumed where the parties use identical marks. *Choice Hotels Int'l, Inc. v. Goldmark Hosp., LLC*, No. 3:12-CV-0548-D, 2014 WL 642731, at *5 n.6 (N.D. Tex. Feb. 19, 2014).

<u>The Parties Do Not Dispute That Their Contemporaneous use of the mark creates a likelihood of confusion</u>

Although the parties' briefings do not address the issue, the evidence included with the motions for summary judgment is sufficient to establish that there is factual evidence that contemporaneous use of the marks creates a likelihood of confusion. A likelihood of confusion

is a required element for trademark infringement and unfair competition claims. There is evidence of substantial similarity between the marks,[1] similarity between the services offered,[2] similarity in the identity of retail outlets and purchasers,[3] and there is evidence that could be construed as actual confusion.[4] Therefore, there is a factual issue regarding whether contemporaneous use of the marks creates a likelihood of confusion.

<u>Kahn Has Raised a Fact Issue as to His Ownership of the Mark DOWNTOWN FEVER in Texas.</u>

Kahn did not establish common law ownership of the mark DOWNTOWN FEVER in Texas prior to his affiliation with Emerald City. The March 2008 performance was a twenty minute set at Taglioli's invitation, for which Kahn and his band were not paid (Dkt. #88 at ¶ 13; Dkt. #116-2 at 18:18–19:13). The second Texas performance of the Downtown Fever band was not until October 2009 (19 months later), and this new band was allegedly associated with Emerald City (Dkt. #116-2 at 53:18–54:4; Dkt. #116-2 at 54:5–18). Between the first performance and the performance that Emerald City was associated with, the only action taken by Kahn was "internet advertising". However, there is no evidence that the advertising reached

---

[1] "Mark similarity 'is determined by comparing the marks' appearance, sound, and meaning.'" *Xtreme Lashes*, 576 F.3d at 228 (quoting *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 201 (5th Cir. 1998)). "Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features." *Xtreme Lashes*, 576 F.3d at 228 (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260–61 (5th Cir. 1980)). In the present case, the fact that the parties used the same DOWNTOWN FEVER mark favors a likelihood of confusion.

[2] "The greater the similarity between the products and services, the greater the likelihood of confusion." *Xtreme Lashes*, 576 F.3d at 229 (quoting *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 505 (5th Cir. 1980)). Here, the fact that the parties provided the same services under the DOWNTOWN FEVER mark favors a finding of likelihood of confusion.

[3] The Fifth Circuit has noted that there may be a likelihood of confusion where the parties "compete directly for the end-users" in a particular market. *Xtreme Lashes*, 576 F.3d at 229. Here, both parties are competing for individuals seeking cover bands for special events. This favors a likelihood of confusion.

[4] "Evidence that consumers have been actually confused in identifying the defendant's use of a mark as that of the plaintiff may be the best evidence of a likelihood of confusion." *Smack Apparel*, 550 F.3d at 483. "Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *Xtreme Lashes*, 576 F.3d at 229–30 (quoting *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971)). Proof of actual confusion is not required for a finding of likelihood of confusion. *Smack Apparel*, 550 F.3d at 483. However, there is documentation that clients were actually confused in this case (Dkt. 127-8 at p. 69)

consumers in Texas.[5] Taken together, these facts do not raise a fact issue as to whether there was continuous, uninterrupted use of the mark in North Texas that would create an association in the mind of the public between the mark and the Downtown Fever band prior to Kahn's affiliation with Emerald City.

There is a fact issue regarding whether or not the verbal agreement between the parties was a licensing agreement; therefore, there is a fact issue regarding which party has common law rights in the DOWNTOWN FEVER mark because the benefits of a licensing agreement inure to the trademark owner. *See, e.g., Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 155 F. Supp. 2d 1, 20 (S.D.N.Y. 2001), *aff'd in part and remanded*, 277 F.3d 253 (2d Cir. 2002) ("Where no goodwill has been transferred with the license, a trademark licensee cannot independently develop its own goodwill in a licensed mark, as such goodwill inures solely to the benefit of the licensor."); *Cotton Ginny, Ltd. v. Cotton Gin, Inc.*, 691 F. Supp. 1347, 1354 (S.D. Fla. 1988) (goodwill is owned by the licensor even if created and expanded by licensee's efforts).

"The elements of a valid contract are (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Prime Prods., Inc. v. S.S .I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App. –Houston [1st Dist.] 2002, pet. denied). In determining the existence of an oral contract, courts look to the communications between the parties and to the acts and circumstances surrounding those communications. *Copeland v. Alsobrook*, 3 S.W.3d 598, 605

---

[5] Kahn testified that he put a picture of the Dallas skyline and the word "Dallas" on the website the Boston band had been using since 2006 (Dkt. #129-1 at 19:17-21:4). Kahn also mentioned that the band advertised on social media but offered no evidence that the advertising was seen by anyone within the state of Texas (Dkt. #129-1 at 19:17-21:4).

(Tex. App. –San Antonio 1999, pet. denied). Here, Kahn has provided summary judgment evidence to establish that whether a valid license contract existed is a question of fact.[6]

Emerald City argues that if a license agreement was formed, it is an invalid naked license because a mark cannot travel by itself without provisions for quality control. However, "[b]ecause naked licensing is generally ultimately relevant only to establish an unintentional trademark abandonment which results in a loss of trademark rights against the world, the burden of proof faced by third parties attempting to show abandonment through naked licensing is stringent." *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1075-76 (5th Cir. 1997) (citation omitted). Furthermore,

> "[w]here the licensed parties have engaged in a close working relationship, and may justifiably rely on each parties' intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated, we would depart from the purpose of the law to find an abandonment simply for want of all the inspection and control formalities."

*Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991), *aff'd sub nom. Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992). There is summary judgment evidence showing that Kahn exercised control in several important aspects of the band (Dkt. #129-22 at ¶¶ 9-13).[7] Therefore, whether or not there was a valid license is a question of fact.[8] Therefore, Emerald City and Taglioli are not entitled to summary judgment on Kahn & Co.'s counter claims of trademark infringement and unfair competition under Texas common law.

---

[6] There is evidence that part of the negotiations between Kahn and Taglioli included that Kahn would give the DOWNTOWN FEVER mark in exchange for an ownership interest in Emerald City Management (Dkt. #116-15). Kahn's performance of owner-like duties, along with Taglioli's alleged statement suggesting that Kahn was a partial owner, are evidence of acceptance, a meeting of the minds, and the party's consent to the terms. Therfore, whether or not there was a valid licensing agreement is a question of fact.

[7] The evidence alleges that Kahn controlled everything from the lighting and the choreography, to the hiring and firing of band members. Kahn also controlled which songs the band performed and was 'the master of ceremonies' for all band performances (Dkt. 129-22 at ¶¶ 9-13).

[8] Emerald City argues that any such agreement violates the statute of frauds because it is "in perpetuity." However, the Statute of Frauds is an affirmative defense that must be pled as such. *See* FED. R. CIV. P. 8(c); *First Nat'l Bank v. Zimmerman*, 442 S.W.2d 674, 677 (Tex. 1969). Therefore, the Court will not consider whether the alleged licensing agreement would constitute a violation of the statute of frauds.

<u>Emerald City Has Raised a Fact Issue Regarding Whether Kahn Assigned the Rights in the Mark.</u>

Emerald City has the burden of proving that there was an assignment as a matter of law. Whether or not there was a valid assignment is a question of fact. An employee can assign a mark that they created independently while continuing to work for the company that they assigned the mark to without it being an assignment in gross. *See Fitzpatrick v. Sony-BMG Music Entm't, Inc.*, No. 07-CIV.-2933-SAS, 2010 WL 3377500, at *1 (S.D.N.Y. Aug. 24, 2010) (holding that CEO validly assigned the company he started the mark that he originated and that the assignment was not in gross because he also assigned the goodwill he generated in that trademark). The fact that Kahn had so much responsibility certainly raises an issue of fact of whether or not this was sufficient control over the quality of the goods associated with a mark.

However, Kahn must also have divested his rights in order for there have been a valid assignment. *See King Pharr Canning Operations v. Pharr Canning Co.*, 85 F. Supp. 150, 156 (W.D. Ark. 1949) (finding that "someone who has used his surname as a trade-mark may transfer or assign it to someone else but then they can no longer use the name in a similar business because of the principle that someone cannot keep the essential thing that they are assigning") (citing *Guth v. Guth Chocolate Co.*, 224 F. 932, 933 (4th Cir. 1915)). As discussed, if a licensing agreement existed then Kahn retained the right to use the DOWNTOWN FEVER mark in connection with his Boston band. However, Emerald City points to Kahn's continued employment with Emerald City as proof that Kahn divested himself of his rights (Dkt. #127 at p. 6 n. 16). Therefore, whether or not Kahn divested himself of his interest in the DOWNTOWN FEVER mark is a question of fact.

<u>Emerald City Has Raised a Fact Issue Regarding Common Law Ownership of the DOWNTOWN FEVER mark.</u>

Emerald City argues that it has ownership of the DOWNTOWN FEVER mark through the following means: 1) continuous, uninterrupted use in the Dallas area, 2) under the rule that an employer owns an employee-conceived mark that the employer uses, and 3) Emerald City is a remote, good-faith user of the mark. However, since the nature of the agreement between the parties is a question of fact, the Court cannot determine whether Emerald City has established common law ownership of the mark in the North Texas area. As discussed above, if the mark was being used via a licensing agreement, the goodwill established by Emerald City would inure to Kahn's benefit.

*There is a Fact Issue as to Whether Emerald City Established Ownership of the DOWNTOWN FEVER Mark Through Continuous, Uninterrupted Use.*

Emerald City asserts that it is the common law owner of the DOWNTOWN FEVER mark in Dallas based on uninterrupted, continuous use of the mark. Kahn formed the band Downtown Fever in Boston in 2006, and regularly performed in that area (Dkt. #118-10 at 14:2–6). In March 2008, Downtown Fever played a single show in Dallas (Dkt. #129-1 at 17:3–17:20). That performance was during a twenty-minute break at an Emerald City concert, at the invitation of Taglioli (Dkt. #116-2 at 18:18–19:11). The second performance of the Downtown Fever band in Texas did not occur until October 2009 (nineteen months later) when Kahn was an employee of Emerald City (Dkt. #116-2 at 54:9–18). Downtown Fever has been regularly performing in North Texas ever since. Taking every reasonable inference in favor of Emerald City, this evidence is sufficient to raise a fact issue as to whether Emerald City established ownership of DOWNTOWN FEVER in Dallas through uninterrupted, continuous use of the mark there, starting on October 2009.

*There Is a Fact Issue as to Whether Emerald City Established Ownership Through Use of an Employee-Conceived Mark.*

There is a fact issue as to whether the DOWNTOWN FEVER mark was developed while Kahn was an employee of Emerald City. Courts have held that a trademark developed by an employee benefits the employer, not the employee. *See Daytona Auto. Fiberglass v. Fiberfab, Inc.*, 475 F. Supp. 33, 36 (W.D. Pa. 1979) (holding that plaintiff was not the owner of "a mark conceived by her [while an employee] and used by the corporation with her permission"). This is true even when the employee was wholly responsible for the development of the mark. *See Smith v. Coahoma Chem. Co.*, 264 F.2d 916, 919 (C.C.P.A. 1959) (holding that the vice president who had developed a mark for his company was not the owner of the mark because "ownership of a mark must be derived from use rather than from a conception of the idea of the mark"); *G's Bottoms Up Soc. Club v. F.P.M. Indus., Inc.*, 574 F. Supp. 1490, 1495 (S.D.N.Y. 1983) ("any trademark rights in the Candle name and logo . . . were rights of Candle Light Tavern, Inc., as owner and operator of the bar," not the former employee who designed the logo).

This rule is an outgrowth of the Supreme Court's holding that "[t]here is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. . . . **[T]he right to a particular mark grows out of its use, not its mere adoption**[.]" *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918) (emphasis added). Emerald City argues that if Kahn established a trademark in Texas, it was during his employment with Emerald City, and thus, it accrues to Emerald City. It is undisputed that Kahn established the mark in Boston prior to working for Emerald City. Thus, to be successful in this claim, Emerald City must prove that the "new" mark was so unique from the previous mark that it could not have transferred any of the previous mark's goodwill with it. Emerald City points to evidence that the new band was substantially different from the band in

Boston (Dkt. #129-1 at 17:3–17:20). However, Emerald City also argues that, "[t]he services performed by Downtown Fever in Boston and Downtown Fever in Texas were not similar, they were identical. And, they were performed by the same person. There was no consumer confusion and there is no evidence that goodwill was excluded or not otherwise transferred (were this even possible)." (Dkt. #127 at p. 6). Therefore, the Court finds that there is an issue of fact regarding whether a new mark was created by Kahn during his employment with Emerald City, and thus, whether Emerald City owns the right accruing to the mark.

*There Is a Fact Issue Regarding Whether Emerald City Is a Remote, Good-Faith User of the Mark.*

The senior user of a mark has priority over junior users where the senior user has carried out business. *Emergency One*, 332 F.3d at 270–71. A junior user may assert an exclusive right to sue on a mark in particular area "(1) if the area was geographically remote from the senior user's market at the time the junior user appropriated the mark and (2) if the junior user was acting in good faith." *Id*. at 271. In the Fifth Circuit, "knowledge of use is but one factor in a good faith inquiry." *C.P. Interests, Inc. v. Cal. Pools, Inc.*, 238 F.3d 690, 700 (5th Cir. 2001) (citing *El Chico, Inc. v. El Chico Cafe*, 214 F.2d 721, 726 (5th Cir. 1954)). The Fifth Circuit has also considered whether the junior user had "an intent to benefit from the reputation or good will" of the senior user. *El Chico*, 214 F.2d at 726.

Emerald City has presented sufficient evidence to raise a fact issue as to whether it has the right to sue on the mark in Texas as a good faith, remote user. Regarding geography, it is undisputed that Dallas is remote from Boston. Regarding Emerald City's good faith use of the mark, Emerald City has testified that Taglioli only agreed to use the DOWNTOWN FEVER mark after Kahn, while an employee of Emerald City, agreed that Taglioli would own the name (Dkt. #127-4 at 20:1–21:6). Also, Kahn testified that his Boston based Downtown Fever band

had only played in Texas once prior to 2009, so it cannot be said that Emerald City was using the mark to capitalize on the Downtown Fever band's reputation or goodwill (Dkt. #127-5 at 16:19–17:8).  Taken together, this is sufficient evidence to raise a fact issue as to whether Emerald City was a good faith, remote user of the mark.

As Emerald City has raised a fact issue as to ownership of the DOWNTOWN FEVER mark and no other elements are contested, Kahn & Co. are not entitled to summary judgment on Emerald City's claims of common law service mark infringement, common law unfair competition, and trademark infringement.

**Kahn's Motion for Summary Judgment Regarding Emerald City's Trademark-Related Causes of Action**

Emerald City has Established That Whether or Not Kahn & Co. Engaged in False Advertising is a Question of Fact.

The prima facie case of false advertising under the Lanham Act has five elements:

(1)     A false or misleading statement of fact about a product;
(2)     Such statement either deceived, or had the capacity to deceive a substantial segment of potential consumers;
(3)     The deception is material, in that it is likely to influence the consumer's purchasing decision;
(4)     The product is in interstate commerce; and
(5)     The plaintiff has been or is likely to be injured as a result of the statement at issue.

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000).  To be considered a "statement of fact," and not merely a "[b]ald assertion[] of superiority or general statement of opinion[]," "the statements at issue must be a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact."  *Id*. at 496 (internal citations and quotations omitted).  Also, "when the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers. . . .  In such a circumstance, the court will assume that the

statements actually misled consumers." *Logan v. Burgers Ozark Country Cured Hams Inc*., 263

F.3d 447, 462 (5th Cir. 2001) (internal citations and quotations omitted).

Kahn & Co. incorrectly argue that Emerald City has not identified any "false or misleading statement[s] of fact" made by Kahn. Emerald City has provided evidence of several false or misleading statements of fact:

1.  After leaving Emerald City, Kahn told potential customers that videos of Emerald City's Downtown Fever band were actually videos of his own band (Dkt. #127-8 at p. 26-27, 72).
2.  After leaving Emerald City, Kahn told potential customer Erin Hayes that the band Downtown Fever no longer operates in the Dallas area, but that his new band could perform for her. Kahn did so while responding to an email that Ms. Hayes had sent to Emerald City (Dkt. #127-8 at pp. 69–71).
3.  On June 3, 2014, after Kahn withdrew from Emerald City, he sent out an email blast stating that he was with "Downtown Fever Bands" (Dkt. #127-5 at pp. 76–77).
4.  In taking control of EC Management LLC's website for the band Downtown Fever, Kahn changed the phone number for EC Management LLC to his own phone number (Dkt. #127-8 at p. 41).
5.  Kahn shut down EC Management LLC's Downtown Fever website and redirected inquiries to his own website (Dkt. #127-8 at p. 41).

Emerald City cites several more examples (Dkt. #127 at pp. 11–13). These five are sufficient

evidence to raise a fact issue as to whether Kahn made a false or misleading statement of fact

about the Downtown Fever band.

There is also evidence raising a fact issue regarding the remaining elements. Regarding

elements 2, 3, and 5, Emerald City has presented evidence that one customer, Ms. Hayes, was

actually deceived by Kahn's false statement and that this false statement influenced her to book

with Kahn's band rather than one of Emerald City's (Dkt. #127-8 at pp. 69–71). Regarding the

fourth element, Emerald City has presented evidence that the Downtown Fever band was

involved in interstate commerce (Dkt. #128-3 at p. 3) (stating several states where Downtown

Fever has performed.) [9]  Summary judgment is inappropriate, as Emerald City has raised a fact issue regarding each element of this claim.

<u>Kahn & Co. are Not Entitled to Summary Judgment on Emerald City's State Law Claim of Trademark Dilution But Are Entitled to Summary Judgment on Emerald City's Federal Claim of Trademark Dilution.</u>

"Trademark dilution is the weakening of the ability of a mark to clearly and unmistakably distinguish the source of a product."  *Dall. Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.*, 616 F. Supp. 2d 622, 642 (N.D. Tex. 2009) (citation omitted).  Kahn & Co. argue that they are entitled to summary judgment on Emerald City's claims of trademark dilution because the DOWNTOWN FEVER mark is not famous under the Trademark Dilution Revision Act (15 U.S.C. § 1125) or the Texas Anti-Dilution Act (TEX. BUS. & COM. CODE ANN. § 16.103).

*Kahn & Co. Are Not Entitled to Summary Judgment for Emerald City's Claim Under the Texas Anti-Dilution Act.*

Kahn & Co. argue that they are entitled to summary judgment on Emerald City's claim for dilution under the Texas Anti-Dilution act because the DOWNTOWN FEVER mark is not sufficiently famous to qualify for protection under the act.  Under the Texas Anti-Dilution Act, "a mark is considered to be famous if the mark is widely recognized by the public throughout this state or in a geographic area in the state as a designation of the source of the goods or services of the mark's owner."  TEX. BUS. & COM. CODE ANN. § 16.103(b).  In assessing fame, a court is to consider the following factors:

1. the duration, extent, and geographic reach of the advertisement and publicity of the mark in this state, regardless of whether the mark is advertised or publicized by the owner or a third party;

---

[9] Kahn & Co. argue that Taglioli's fourth affidavit (Dkt. #128-3) should not be considered because it contains unsupported, conclusory, and unspecific statements and seeks to authenticate documents produced after the close of discovery (Dkt. #132 at p. 1).  In this order, the Court only considers his testimony regarding how many shows his band has performed and where.  As these facts are within Mr. Taglioli's personal knowledge and would be admissible at trial, the Court may consider these facts for the purposes of summary judgment.  *See* FED. R. CIV. P. 56(c)(4).

2.     the amount, volume, and geographic extent of sales of goods or services offered under the mark in this state;

3.     the extent of actual recognition of the mark in this state; and

4.     whether the mark is registered in this state or in the United States Patent and Trademark Office.

TEX. BUS. & COM. CODE ANN. § 16.103(b)(1)–(4).

Emerald City has produced sufficient evidence to raise a fact issue as to whether DOWNTOWN FEVER is a famous mark in the Dallas/Fort Worth region of Texas. Taglioli has provided an affidavit stating that since 2009 the Downtown Fever band has advertised over the internet, YouTube, and Facebook, and has "a data base of approximately 8,000 potential customers which Emerald City has emailed advertising for [EC Management LLC's] Downtown Fever [band]." (Dkt. #128-3 at p. 2). This is sufficient evidence to raise a fact issue regarding the duration, extent, and reach of advertising in the Dallas/Fort Worth region of Texas.

Emerald City has also produced evidence that raises a fact issue regarding the extent of sales and recognition. Taglioli states that the Downtown Fever band has "performed at approximately 700 events" since the fall of 2009, "with about 87 % of those performances in the Dallas/Fort Worth area." (Dkt. #128-3 at p. 2). This means that "Downtown Fever" has performed approximately 609 performances in the Dallas/Fort Worth area over the last six years, which amounts to 100 times per year (roughly twice a week) in the Dallas/Fort Worth area. An additional 11% of its 700 performances were in other parts of Texas, including "Abilene, Austin, Bryan, Dripping Springs, Houston, Longview, Lubbock, Midland, San Angelo, San Antonio, Tyler, and Waco." (Dkt. #128-3 at pp. 2–3). This is sufficient to raise a fact issue regarding the extent of sales and recognition.

Finally, the DOWNTOWN FEVER mark is registered in the state of Texas (Dkt. #127-3 at p. 6).[10]  Although it has yet to be determined whether the benefit of the "fame" of the mark inures to the benefit of Emerald City or Kahn, Emerald City has presented sufficient evidence to raise a genuine issue of fact as to whether the DOWNTOWN FEVER mark is famous in Texas under the Texas Anti-Dilution Act.

*Kahn & Co. Are Entitled to Summary Judgment on Emerald City's Claim Under the Federal Trademark Dilution Revision Act.*

The first element of a federal Trademark Dilution Revision Act claim is that the moving party "owns a famous and distinctive mark."  *Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 536 (5th Cir. 2012) (citing *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 264–65 (4th Cir. 2007)).  A famous mark is defined as one that "is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).  In assessing whether a mark is famous, courts consider the following factors:

1. The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
2. The amount, volume, and geographic extent of sales of goods or services offered under the mark.
3. The extent of actual recognition of the mark.
4. Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. 1125(c)(2)(A)(i)–(iv).  Commentators have stated that only "truly eminent and widely recognized marks" should be classified as famous, distinctive marks under federal law.  4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:104 (4th ed.

---

[10] Under Texas law, registration of a mark does not adversely affect the common-law rights of others established prior to registration.  TEX. BUS. & COMM. CODE § 16.107.  Registration in Texas merely creates a rebuttable presumption that the party registering the mark is the owner.  "Any advantage is only procedural."  *All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 489 (Tex. App.—Fort Worth 1999, no pet.).  "Once the burden is discharged and evidence contradicting the presumption has been offered, the presumption is extinguished and shall not be weighed or treated as evidence."  *Id.*

2015); *see* Barton Beebe, *A Defense of the New Federal Trademark Antidilution Law*, 16 Fordham Intell. Prop. Media & Ent. L.J. 1143, 1158 (2006) ("[The Trademark Dilution Revision Act] is simply not intended to protect trademarks whose fame is at all in doubt.").

Examples of famous, distinctive marks include Budweiser beer, Camel cigarettes, and Barbie dolls. *Bd. of Regents, Univ. of Tex. Sys. ex rel. Univ. of Tex. at Austin v. KST Elec., Ltd*., 550 F. Supp. 2d 657, 679 (W.D. Tex. 2008). By contrast, the "longhorn silhouette logo" of the University of Texas is not a famous mark because it only has "niche market fame" in the context of college sports and is not "widely recognized by the general consuming public of the United States." *Id.* at 678 (quoting 15 U.S.C. § 1125(c)(2)(A) (finding that "[b]ecause UT's evidence fails to demonstrate the extremely high level of recognition necessary to show 'fame' under the TDRA, summary judgment is appropriate on this claim."); *compare with Univ. of Kansas v. Sinks*, 644 F. Supp. 2d 1287, 1307 (D. Kan. 2008), *amended in part* (July 28, 2009) (finding sufficient summary judgment evidence of national fame where plaintiff submitted evidence of national media coverage, exposure of the athletic teams, that the school had "been referred to as "Kansas" since the 1930s and that KU has used the crimson and blue color scheme and the Jayhawk mascot for over 100 years.").

Emerald City provides no argument and presents no evidence that DOWNTOWN FEVER is a famous and distinctive mark for the purposes of the Trademark Dilution Revision Act. Of its 700 performances over the last six years, only about two percent were outside of the state of Texas. (Dkt. #128-3 at p. 3). In other words, about fourteen performances outside of Texas in the following named places: "Bossier City, New Orleans, and Shreveport, Louisiana; Chicago, Illinois; Kansas City, Kansas; Oklahoma City, and Tulsa, Oklahoma; Phoenix, Arizona; Santa Fe, New Mexico; St. Louis, Missouri; and Vail, Colorado." (Dkt. #128-3 at p. 3). This is

insufficient to place the DOWNTOWN FEVER mark on the same level as the University of Texas's "longhorn silhouette logo," much less Budweiser, Camel, or Barbie. Emerald City has not presented sufficient evidence to raise a fact issue as to whether "Downtown Fever" is a famous and distinctive mark for the purposes of the Trademark Dilution Revision Act. Kahn & Co. are entitled to summary judgment on this claim.

**Emerald City's Motion for Summary Judgment Regarding Kahn's Trademark-Related Causes of Action.**

<u>Whether or Not Emerald City Fraudulently Registered With the State of Texas is a Question of Fact.</u>

Kahn & Co.'s raising of a genuine issue of fact regarding ownership of the DOWNTOWN FEVER mark in Texas suggests that there is a fact issue regarding their counterclaim of fraudulent registration with the State of Texas. Kahn & Co. specifically allege fraudulent registration on the basis that Emerald City, when registering for a Texas trademark, stated that its first use of DOWNTOWN FEVER was in 2005, not 2009 (Dkt. #88 at ¶ 61).

Under Texas law:

A person who procures for the person or another the filing of an application or the registration of a mark under this chapter by knowingly making a false or fraudulent representation or declaration, oral or written, or by any other fraudulent means, is liable to pay all damages sustained as a result of the filing or registration.

TEX. BUS. & COM. CODE ANN. § 16.101. In adopting this statute, the Texas legislature stated that "the construction given to the Trademark Act of 1946 (15 U.S.C. Section 1051 et seq.) should be examined as persuasive authority for interpreting and construing this Act." Registration and Protection of Trademarks, 2011 Tex. Sess. Law Serv. Ch. 563 (H.B. 3141); *see also Condom Sense*, 390 S.W.3d at 738 (stating that Texas courts "look to the Lanham Act and cases thereunder for generally accepted principles of substantive trademark law and to discern meaning and interpretation of the state law provisions"). To overcome a motion for summary judgment

on a claim of fraudulent registration of a trademark, Kahn[11] must prove the following: "1) the false representation regarding a material fact; 2) the registrant's knowledge or belief that the representation is false (scienter); 3) the intention to induce action or refraining from action in reliance on the misrepresentation; 4) reasonable reliance on the misrepresentation; and 5) damages proximately resulting from such reliance." *Texas Int'l Prop. Associates v. Hoerbiger Holding AG*, 624 F. Supp. 2d 582, 592 (N.D. Tex. 2009) (citation omitted); *see also United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1226 (10th Cir. 2000); *King–Size, Inc. v. Frank's King Size Clothes, Inc.*, 547 F.Supp. 1138, 1166 (S.D.Tex.1982). A material misrepresentation arises only if the registration would not have issued if the truth were known to the examiner. *San Juan Prod., Inc. v. San Juan Pools of Kan., Inc.*, 849 F.2d 468, 473 (10th Cir. 1988). "Allegedly fraudulent statements must show a deliberate attempt to mislead the Patent and Trademark Office and may not be the product of mere error or inadvertence." *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 153 F. Supp.2d 512, 524 (S.D.N.Y. 2001), *aff'd*, 43 F. App'x 408 (2nd Cir. 2002).

As already noted, it is unclear which party is the owner of the DOWNTOWN FEVER mark in Texas. However, Kahn has alleged that there was a materially false representation of both the first date that Emerald City began using the mark and when *Emerald City* first used the mark in Texas (Dkt. #129-13). Kahn has provided evidence that the only agreement that might have existed between the parties is a licensing agreement under which Emerald City representations were false (Dkt. #116-15). Emerald City's misstatement on the registration application is sufficient to show that Emerald City was attempting to induce action through the

---

[11] In order to meet its initial summary judgment burden against Kahn's fraudulent registration claim, Emerald City needed only to present the registration, which it did. *See* Tex. Bus. & Com. Code § 16.060 (Certificate of Trademark Registration constitutes prima facie proof of validity and ownership of the mark in Texas). The burden then shifted Kahn to come forward with evidence of a fraudulent registration.

misrepresentation which would reasonably be relied upon by the registering party (Dkt. #129-13). Finally, Kahn is claiming that he was damaged by Emerald City's misrepresentation because he has an ownership interest in the mark. *See Jackson v. Lynley Designs, Inc.*, 729 F. Supp. 498, 500 (E.D. La. 1990) (stating that fraudulent registration of a mark causes damages only to a party that has an underlying interest in the mark). There are genuine issues of fact regarding this counterclaim such that Emerald City is not entitled to summary judgment.

**Cybersquatting**

Kahn & Co. also seek summary judgment on Emerald City's claim of cybersquatting under the Anti-Cybersquatting Consumer Protection Act ("ACPA") (15 U.S.C. § 1125(d)). According to Emerald City, after Kahn left the company, he redirected web traffic from Emerald City's Downtown Fever website, "www.downtownfever.com," to a new website that Kahn registered, "www.usa.downtonfever.com." (Dkt. #81 at ¶¶ 40–42).

The elements for a claim under the ACPA are: (1) the mark is a famous or distinctive; (2) the domain name is "identical or confusingly similar" to the mark; and (3) the individual registering for the domain name had a bad faith intent to profit from the domain name. 15 U.S.C. § 1125(d)(1)(A); *Tex. Int'l Prop. Assocs. v. Hoerbiger Holding AG*, 624 F. Supp. 2d 582, 587 (N.D. Tex. 2009). In arguing for their respective sides, the parties focus exclusively on the third element, whether Kahn had a bad faith intent to profit from the mark.

The ACPA lists nine non-exclusive factors to consider in determining whether bad faith exists:

> (I)     the trademark or other intellectual property rights of the person, if any, in the domain name;
> (II)    the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
> (III)   the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV)    the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V)    the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI)    the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII)    the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII)    the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX)    the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous . . . .

15 U.S.C. § 1125(d)(1)(B)(i).  "The first four [factors] suggest circumstances that may tend to indicate an absence of bad-faith intent to profit from the goodwill of a mark, and the others suggest circumstances that may tend to indicate that such bad-faith intent exists." *Lamparello v. Falwell*, 420 F.3d 309, 319 (4th Cir. 2005).  In addressing these factors, a court is to consider the totality of the circumstances and "not simply count up which party has more factors in its favor after the evidence is in." *Id*.  Because the factors are merely permissive, the court need not consider all factors in every case. *Id*.

<u>There Is a Fact Issue as to Whether Kahn Had a Bad Faith Intent to Profit.</u>

Factor V indicates bad faith intent to profit from the registration of "www.downtownfever.com."  Kahn registered the domain name on behalf of Emerald City, but

used his own name and contact information to do so (Dkt. 127-3 at pp. 3-4). Emerald City claims that it specifically instructed Kahn to register the website in Emerald City's name (Dkt. #127-3 at pp. 3-4). Kahn argues that there is no evidence that Kahn had a bad faith intent to profit at the time that he registered the domain name. However, Kahn's subsequent actions of taking control of the website, and changing the contact phone number to his own, suggest that registration in Kahn's name might have been a calculated choice. *See DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1220 (9th Cir. 2010) ("Evidence of bad faith may arise well after registration of the domain name.") (citation omitted). As mentioned above, the Court is to consider the totality of the circumstances. 15 U.S.C. § 1125(d)(1)(B)(ii). This includes actions taken after an employee quits. *See DSPT Int'l, Inc,*. 624 F.3d at 1224 (affirming finding that former employee who registered website in his own name and then later changed the website to direct inquiries to himself after he quit, had violated the Anticybersquatting Consumer Protection Act.) While the registration of the domain name in Kahn's name might not alone constitute evidence of bad faith, Kahn's subsequent actions suggest that this might have been a calculated choice made in bad faith.

Factor V is provides support for Kahn's alleged bad faith intent to profit from the registration of "www.usa.downtownfever.com." There is evidence that the website was opened in order to divert Emerald City customers to Kahn (Dkt. #127-8 at 47:12–24; Dkt. #127-9 at 3). Emerald City witnesses have testified that one of the major differences between the websites was that the second website listed Kahn's personal phone number as the contact number, not Emerald City's (Dkt. #127-8 at 47:19–22; Dkt. #127-4 at 88:8–23). Kahn & Co. have not explained why Kahn would have changed the phone number of the new website to his personal number if he did not intend to have customers contact him. Weighing this evidence in favor of Emerald City, the

non-moving party, the evidence is sufficient to raise a fact issue as to whether Kahn had a bad faith intent to profit from the use of the domain name.

Kahn & Co. are incorrect in arguing that they are entitled to summary judgment because Kahn did not register either website just so that he could hold it for ransom until Emerald City offered him money for it (Dkt. #118 at p. 15). Courts have found bad faith intent to profit from a domain name even where the holder did not make an offer to sell the domain name. *See Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC*, 875 F. Supp. 2d 511, 517 (D. Md. 2012) (holding that defendants had a bad faith intent to profit from a confusing similar domain name, even though it was being used for a legitimate business and there had been no offer to sell); *Hoerbiger Holding*, 624 F. Supp. 2d at 590 (holding that domain holder had bad faith intent to profit, even though he "refused to sell the . . . domain name and ha[d] never made an offer to sell the name" because, among other things, he "was using the name for another source of monetary gain"). This is consistent with the idea that "[t]he factors are given to courts as a guide, not as a substitute for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit." *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 811 (6th Cir. 2004).

The two cases cited by Kahn & Co. are not persuasive. It is true that the Fifth Circuit found no bad faith intent to profit in a case where "[t]he paradigmatic harm that the ACPA was enacted to eradicate—the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark—[was] simply not present." *TMI, Inc. v. Maxwell*, 368 F.3d 433, 439 (5th Cir. 2004) (citation omitted). But in that case, the offensive domain name was for "a non-commercial gripe site" that the domain holder never used for

business purposes.  *Id*.  In the present case, the fact that Kahn put his contact number on the new website suggests an intent to profit.

Kahn & Co. cite a Third Circuit case for the proposition that "[t]he purpose of the Anti-Cybersquatting Act is to 'curtail one form of cybersquatting—the act of registering someone else's name as a domain name for the purpose of demanding remuneration from the person in exchange for the domain name.'"  *Schmidheiny v. Weber*, 319 F.3d 581, 582 (3d Cir. 2003) (citation omitted).  But that statement is a senator's quotation from the Congressional Record, and the Supreme Court has cautioned against relying upon legislative history when the text of the statute is clear.  *See, e.g.*, *United States v. Gonzales*, 520 U.S. 1, 6 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history.").  And in the present case, the factors to consider are permissive, with no mandatory requirement that the analysis hinges on whether there has been an offer for sale of the domain site.  For these reasons, Kahn & Co. are not entitled to summary judgment on Emerald City's claim of cybersquatting.

<u>Whether or Not Kahn Can Invoke the Safe Harbor Provision is a Question of Fact.</u>

Under the FTCA, "[b]ad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."  15 U.S.C. § 1125(d)(1)(B)(ii).  In the present case, Kahn knew about Emerald City's Texas registration for the mark DOWNTOWN FEVER at least two years prior to filing suit (Dkt. #127-4 at 72:10–15, 76:3–16).  He also developed a new website that was largely identical to Emerald City's original website to offer a product with the same name as the registered Texas trademark (Dkt. 127-8 at pp. 26-94).  However, Kahn also argues that this was only a licensing agreement, making it reasonable for him to believe that he still owned the mark (Dkt. #88 at ¶ 41).  This evidence raises a fact issue as to whether Kahn

"had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

**Copyright Infringement**

Kahn & Co. are incorrect in arguing that they are entitled to summary judgment on the ground that Emerald City lacks standing to sue for copyright infringement. The party invoking federal jurisdiction bears the burden of establishing standing, which "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). On summary judgment, this means "set[ting] forth, by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id*. (internal citations and quotations omitted).

Under the Copyright Act, "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). A certificate of registration, if timely obtained, is prima facie evidence both that a copyright is valid and that the registrant owns the copyright. *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004)

Ownership "vests initially in the author or authors of the work," but "may be transferred in whole or in part by any means of conveyance or by operation of law." 17 U.S.C. § 201(a), (d). A valid transfer requires "a note or memorandum of the transfer" that is "in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a); *see Tempest Pub., Inc. v. Hacienda Records & Recording Studio, Inc.*, No. CIV.A. H-12-736, 2013 WL 5964516, at *7 (S.D. Tex. Nov. 7, 2013) ("A plaintiff asserting copyright ownership through transfer lacks statutory standing to pursue an infringement claim if there is no signed

writing documenting the transfer."). The memorandum need not be signed contemporaneously with the assignment to be valid. *See Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc.*, 70 F.3d 96, 99–100 (11th Cir. 1995) ("[Section] 204(a) can be satisfied by an oral assignment later ratified or confirmed by a written memorandum of the transfer.") (internal citations and quotations omitted). Some courts have even allowed standing to be corrected through a second assignment; *see also Seastrunk v. Darwell Integrated Tech., Inc.*, No. 3:05-CV-0531-G, 2005 WL 1667811, at *5 n.2 (N.D. Tex. July 15, 2005) (collecting cases).

Emerald City has established that it has standing to sue because it is a copyright owner through valid assignment. Regarding the "Downtown Fever Design Logo," there is a "Confirmatory Copyright Assignment," signed December 4, 2014, saying that the assignment was made effective on April 8, 2010, when EC Management LLC tendered a check to the author (Dkt. #128-8). There is also an assignment for the "Downtown Fever Website," signed November 18, 2014, saying that the assignment was made effective on June 20, 2013, when the website was first published (Dkt. #128-9). The authors of both works were paid with checks that were attached as exhibits to the assignments. On summary judgment, these facts are sufficient to establish standing.

Kahn & Co. are incorrect in arguing that EC Management LLC lacks standing to sue because the copyright assignments to EC Management LLC did not explicitly confer a "right to sue" and because they were signed after commencement of the lawsuit.[12] Courts generally only

---

[12] While Kahn & Co. cite one case that asserts that an assignment is not valid if it is memorialized after a lawsuit has commenced, the Court is not persuaded by their argument. The Court finds that the majority of courts confronted with this issue have determined that memorization of an assignment that occurred prior to the alleged copyright infringement may occur after the commencement of a lawsuit. *See Intimo, Inc. v. Briefly Stated, Inc.*, 948 F.Supp. 315, 318 (S.D.N.Y.1996) (giving effect to a "very late" amendment granting the plaintiff the right to bring accrued causes of action after commencement of the lawsuit but before trial); *Godinger Silver Art Co. v. Int'l Silver Co.*, No. 95 CIV. 9199 (LMM), 1995 WL 702357, at *4 (S.D.N.Y. Nov. 28, 1995) ("This assignment, even though subsequent to the commencement of this action, is a sufficient basis for the continued maintenance of plaintiff's claim."); *Infodek, Inc. v. Meredith-Webb Printing Co.*, 830 F. Supp. 614, 620-21 (N.D. Ga. 1993) (denying summary

require that an assignment explicitly provides the right to sue where a party is suing for infringing activity that precedes the assignment.[13]  The present case does not present this situation because Emerald City does not allege copyright infringement until June 19, 2014 (Dkt. #81 at ¶ 21), which is over a year after Emerald City claims it was assigned the copyrights to the works (Dkt. #128-8; Dkt. #128-9).  For these reasons, the failure of the assignment to explicitly confer a "right to sue" and to be memorialized before the commencement of a lawsuit does not mean Emerald City lacks standing.[14]   Emerald City, therefore, has standing to sue for infringement of its copyrights in the Downtown Fever Website and the Downtown Fever Design Logo.

**Misappropriation of Trade Secrets**

Kahn and Co. argue that Emerald City's claim of trade secret misappropriation should be dismissed because Emerald City failed to disclose its trade secrets in its initial disclosures under Federal Rule of Civil Procedure 26(a) and in response to requests for production (Dkt. #118 at 19–20).  Under Rule 26(a), a party must provide "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the

---

judgment and finding standing to sue for a copyright infringement that accrued prior to the assignment of the right to sue, even though the assignment occurred after suit had been filed); *but see Prof'l LED Lighting, Ltd. v. AAdyn Tech., LLC*, 88 F. Supp. 3d 1356, 1371 (S.D. Fla. 2015) (citing no case law but finding that "later memorialization must still pre-date the litigation asserting the assigned rights in order to confer standing on the assignee.")

[13] *See ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991) (holding that "the assignee is only entitled to bring actions for infringements that were committed while it was the copyright owner"); *Seastrunk v. Darwell Integrated Tech., Inc.*, No. CIV.A. 3:05-CV-0531-G, 2005 WL 1667811, at *3 (N.D. Tex. July 15, 2005) (stating that an assignee lacked standing to sue for accrued copyright claims where "the Assignment Agreement [did] not expressly assign him the right to do so"); *Sabroso Publ'g, Inc. v. Caiman Records Am., Inc.*, 141 F. Supp. 2d 224, 227–28 (D.P.R. 2001) (holding that an assignee had standing where it had been explicitly assigned "all of [assignor's] copyrights, trademarks and assets, including, without limitation, all past, present and future actions for copyright infringement that have accrued to this date, or may accrue in the future . . . .").

[14] This conclusion is consistent with the approach of the Eleventh Circuit, which has reasoned that "the chief purpose of section 204(a), (like the Statute of Frauds), is to resolve disputes between copyright owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership." *Imperial*, 70 F.3d at 99.  Because of this, "where there is no dispute between the copyright owner and the transferee about the status of the copyright, it would be unusual and unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement." *Id.*

disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." FED. R. CIV. P. 26(a)(1)(A)(ii).

Under the Court's local rules, this includes "information that deserves to be considered in the preparation, evaluation or trial of a claim or defense" and "information that reasonable and competent counsel would consider reasonably necessary to prepare, evaluate, or try a claim or defense." Local Rule CV-26(d)(4)–(5). Failure to disclose can result in a party not being "allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).

In addressing whether a failure to disclose was harmless, courts look to the following factors: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Primrose Operating Co. v. Nat'l Am. Ins. Co*., 382 F.3d 546, 563–64 (5th Cir. 2004).

The Failure to Disclose Customer Lists and Music Tracks Was Substantially Justified.

Factors two and four suggest that failure to disclose was harmless. Evidence of customer lists and music tracks is clearly important (factor one) to Emerald City's case. However, the Court believes that Emerald City's failure to produce these items did not create any prejudice (factor two). Emerald City explained that it did not produce the Customer List and the music tracks because Kahn has admitted to copying the customer list and having possession of the music tracks (Dkt. #127-5 at 102:24–103:16; 125:20–126:12).

Emerald City explained that it did not produce the music tracks and customer list because Kahn already has them (factor four). Furthermore, Kahn & Co.'s failure to file a motion to compel regarding these items further suggests that Emerald City's failure to produce has not prejudiced Kahn & Co.'s case. Lastly, consideration of whether a continuance would cure any

prejudice (factor three) is neutral because the Court does not believe that the failure to produce has created prejudice in this case. Emerald City's explanations for non-disclosure support a finding of harmlessness. Therefore, the Court will consider the evidence concerning these trade secrets.

Emerald City's Failure to Disclose Passwords Was Substantially Justified.

Emerald City's reason for not disclosing its passwords was that Kahn took them when he left Emerald City. Emerald City did not obtain its passwords until after a preliminary injunction was issued ordering Kahn to give them back (Dkt. #77). Under these circumstances, failure to disclose passwords was substantially justified.

Emerald City has presented sufficient evidence to raise a fact issue regarding the misappropriation of trade secrets.

Because the alleged misappropriation occurred after September 1, 2013, the Texas Uniform Trade Secrets Act ("TUTSA") applies. *See* Adoption of Uniform Trade Secrets Act, 2013 TEX. SESS. LAW SERV. Ch. 10 (S.B. 953) ("The change in law made by this Act applies to the misappropriation of a trade secret made on or after the effective date [September 1, 2013] of this Act."). Under the TUTSA, one of the definitions of misappropriation is:

> disclosure or use of a trade secret of another without express or implied consent by a person who:
> (i) used improper means to acquire knowledge of the trade secret;
> (ii) at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
> (a) derived from or through a person who had utilized improper means to acquire it;
> (b) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> (c) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> (iii) before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(3)(B). 1516; *see Beardmore v. Jacobson*, No. 4:13-CV-361, 2015 WL 5530398, at *11 (S.D. Tex. Sept. 18, 2015) ("Trade secret misappropriation under Texas law is established by showing (a) a trade secret existed; (b) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (c) use of the trade secret without authorization from the plaintiff.") (citing *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 600 (5th Cir. 2015). Emerald City has presented sufficient evidence to raise a fact issue as to whether the music tracks and customer lists at issue qualify as trade secrets under TUTSA and whether Kahn misappropriated them. However, passwords do not qualify as trade secrets under TUTSA.

*Element 1 – There Is a Fact Issue as to Whether the customer list and music tracks are Trade Secrets but passwords are not subject to a misappropriation claim.*

Under the TUTSA, a trade secret is defined as:

information, including a formula, pattern, compilation, program, device, method, technique, process, financial data, or list of actual or potential customers or suppliers, that: (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(6).

Any claim of misappropriation of the music tracks is not preempted by the Copyright Act (finding that "state law claims based on ideas fixed in tangible media are preempted by § 301(a).") Trade secret misappropriation is not preempted by the Copyright Act, because it includes an "extra element" of breach of confidentiality or improper methods, which is not equivalent to any of the exclusive rights of copyright. *M–I LLC v. Stelly*, 733 F. Supp. 2d 759, 786 (S.D.Tex.2010); *GlobeRanger Corp. v. Software AG USA, Inc.*, 3:11–CV–0403–B, 2015

WL 3648577, at *4 (N.D.Tex. June 11, 2015); *Stromback v. New Line Cinema*, 384 F.3d 283, 303 (6th Cir. 2004) (collecting cases).

It is well established that customer lists can constitute trade secrets under Texas law. Items such as customer lists, pricing information, client information, customer preferences, and buyer contacts may be trade secrets if they meet the criteria for such. *A.M. Castle & Co. v. Byrne*, No. CIV.A. H-13-2960, 2015 WL 4756928, at *4 (S.D. Tex. Aug. 12, 2015) (citing *Glob. Water Grp., Inc. v. Atchley*, 244 S.W.3d 924, 928 (Tex. App.—Dallas 2008, pet. denied); *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003) (holding that a customer list may be a trade secret if it is secret and the court examines if it satisfies three factors: "(1) what steps, if any, an employer has taken to maintain the confidentiality of a customer list; (2) whether a departing employee acknowledges that the customer list is confidential; and (3) whether the content of the list is readily ascertainable.").

However, passwords do not qualify as a trade secret under TUTSA because they do not have the "independent economic value" in the sense of a "formula or customer list." *State Analysis, Inc. v. Am. Fin. Servs. Assoc.*, 621 F. Supp. 2d 309, 321 (E.D. Va. 2009) ("Where a plaintiff has not alleged that its passwords are the product of any special formula or algorithm that it developed, the passwords are not trade secrets.") (citing *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 331 F.Supp.2d 396, 429 n. 4 (E.D. Va. 2004) ("A trade secret is information and a CD Key, a series of random numbers, is not information. Instead, it is a lock—a barrier—to the access of information that might properly be considered a trade secret.")). As a matter of law, passwords do not qualify as a trade secret under TUTSA.

Taglioli testified that all of the above information was kept secret and not disseminated outside of Emerald City's business, that Emerald City took measures to protect the information

by obtaining confidentiality agreements, that Filemaker was priceless and that it was incapable of valuation, and that the information contained on Filemaker could not be acquired or duplicated by others (Dkt. #127-1 at ¶¶ 60 – 61; Dkt. #127-8 at p. 30).  On summary judgment, this is sufficient to raise a fact issue as to whether the music tracks and customer lists are trade secrets.  However, as a matter of law, passwords do not qualify as trade secrets.

*Element 2 – There Is a Fact Issue as to Whether Trade Secrets Were Used Without Express or Implied Consent.*

There is also a fact issue as to whether Kahn had express or implied consent to use trade secrets after his employment.  Drawing all reasonable inferences in favor of Emerald City, it is reasonable to conclude on summary judgment that Emerald City would not want Kahn to use his former employer's passwords and customer lists after leaving Emerald City.  At no point does Kahn suggest otherwise.  Emerald City, then, has raised a fact issue regarding the second element.

*Element 3 – There Is a Fact Issue as to Whether Kahn Had a Duty to Maintain Secrecy of the Trade Secrets.*

There is a fact issue as to whether Kahn "at the time of disclosure or use, knew or had reason to know that [his] knowledge of the trade secret was:" (1) "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;" or (2) "derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(3)(B)(ii)(b)–(c).  As already discussed for Emerald City's "breach of fiduciary duty" claim, Emerald City has presented evidence to raise a fact issue as to whether a fiduciary relationship exists between Emerald City and Kahn, based on Kahn's access to confidential information, including passwords and customer lists, during his employment.  This same evidence also raises a fact issue as to whether Kahn had a duty to limit

the use of Emerald City's passwords and customer lists following the termination of his employment. *See Am. Derringer Corp.*, 924 S.W.2d at 777 (holding that the duty to not use "confidential or proprietary information acquired during [employment] in a manner adverse to the employer . . . survives termination of employment [and] prevents the former employee's use of confidential information or trade secrets acquired during the course of employment.") Emerald City, therefore, has presented evidence to raise a fact issue as to every element of a claim of misappropriation of trade secrets under the TUTSA.

**Breach of Fiduciary Duty**

Under Texas law, the elements of a claim for breach of fiduciary duty are: "(1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (internal citations omitted). An informal fiduciary relationship "may arise where one person trusts in and relies upon another," including a relationship between an employer and an employee. *Id.* In an employment relationship, Texas courts have held that the duty prohibiting "an employee from using confidential or proprietary information acquired during the relationship in a manner adverse to the employer" is an obligation that "survives termination of employment" and "arise[s] apart from any written contract." *Am. Derringer Corp. v. Bond*, 924 S.W.2d 773, 777 (Tex. App.—Waco 1996, no writ).

Emerald City has raised a fact issue as to whether Kahn's use of Downtown Fever's social media accounts and Emerald City's trade secrets constitute a breach of fiduciary duty. Emerald City has also raised a fact issue regarding Kahn's registration of web pages and social media accounts in his own name rather than Emerald City's.

<u>There Is a Fact Issue Regarding Whether Kahn's Use and Registration of Emerald City's Social Media Accounts After His Termination Constitute a Breach of Fiduciary Duty.</u>

Emerald City has presented evidence sufficient to raise a fact issue as to whether a fiduciary relationship existed between Kahn and Emerald City. Taglioli has testified that Kahn was at one point "second in command of Plaintiffs" and "eventually became the director of Operations and Production of Emerald City Management." (Dkt. #127-3 at p. 3). In this capacity, he was entrusted with confidential information, including passwords, and was personally involved in website development (Dkt. #127-3 at p. 3). This is evidence of a relationship of confidence and trust (element one) which raises a fact issue as to whether a fiduciary relationship exists.

There is also evidence that Kahn breached this duty (element two) by redirecting Emerald City's web traffic to his own website and by locking Emerald City out of its social media accounts (Dkt. #127-3 at p. 4). This breach at least caused damage (element three) by loss of the business of individuals who accessed the website, but were unable to contact Emerald City (Dkt. #54-1 at pp. 2). Furthermore, it is reasonable that Kahn's initial registration of these accounts in his name led to Emerald City being unable to access these accounts (Dkt. #54-1 at pp. 2-3). Therefore, Emerald City has presented evidence raising a fact issue regarding whether Kahn's registration of the various media accounts and website in his own name, and his use of Emerald City's passwords after his termination constitute a breach of fiduciary duty.

<u>There Is a Fact Issue Regarding Whether Kahn's Taking and Use of Emerald City's Trade Secrets Constitute a Breach of Fiduciary Duty.</u>

Kahn allegedly took the trade and Emerald City at the time of his departure from Emerald City. As discussed above, whether a fiduciary relationship existed at the time (element one) is a question of fact. Emerald City has alleged that Kahn's taking of the customer list and music tracks were clearly without permission, and thus violated Kahn's fiduciary duty. Furthermore,

Emerald City has presented evidence that Kahn profited from his taking and using of these materials (Dkt. # 118-16). Therefore, whether or not Kahn's taking and use of Emerald City's trade secrets constitutes a breach of Kahn's fiduciary duty is a question of fact appropriate for a jury's consideration.

**Tortious Interference with Existing Contracts**

Emerald City has raised a fact issue regarding its claim of tortuous interference with existing contracts. To establish a claim of tortious interference with existing contracts, the plaintiff must show: (1) there was a valid contract; (2) the defendant willfully and intentionally interfered with the contract; (3) the interference proximately caused damage; and (4) the plaintiff suffered actual damage or loss. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002). "Proximate cause in the context of a tortious interference claim involves both cause-in-fact and foreseeability." *Moriarty v. Malcolm Pirnie, Inc.*, No. 03-08-00665-CV, 2010 WL 1170244, at *3 (Tex. App.—Austin Mar. 25, 2010, no pet.). "Establishing causation requires that the plaintiff bring forth sufficient facts so that the evidence, and logical inferences drawn from the evidence, support a reasonable probability that the defendant's acts or omissions were a substantial factor in bringing about injury." *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 474 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (citation omitted).

There is evidence that Kahn interfered with four contracts between Emerald City and its customers by steering the customers to use Kahn's Downtown Fever band rather than Emerald City's Downtown Fever band (Dkt. # 118-5 at 84:2–85:15; Dkt. # 118-16). This resulted in Emerald City refunding those customers' deposits, resulting in damages from lost profits. Taken together, this raises a fact issue regarding elements one, two, and four.

This evidence also raises a fact issue as to the "proximate cause" element. Drawing all reasonable inferences in favor of Emerald City, there is a fact issue as to whether Kahn's interference was "a substantial factor in bringing about injury." *Richardson-Eagle*, 213 S.W.3d at 474. Also, it is foreseeable that a company in Emerald City's position would choose to refund the down payments rather than demand full contractual payment. "Proximate cause is a question for the trier of fact." *GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F. Supp. 2d 712, 742 (N.D. Tex. 2010) (citing *Richardson-Eagle*, 213 S.W.3d at 474). As there is a fact issue, Kahn & Co. are not entitled to summary judgment on this claim.

**Tortious Interference with Prospective Business Relationships**

Emerald City has presented sufficient evidence to raise a fact issue regarding tortious interference with prospective business relations between Emerald city and three customers—The Susan G. Komen Foundation ("Komen"), Mr. James Diehl ("Diehl"), and My Possibilities. According to the complaint, Kahn did so by taking over Emerald City's social media accounts and using an Emerald City e-mail address to contact customers, even after his employment with Emerald City had ended (Dkt. #81 at ¶ 59).

To prevail on a claim of tortious interference with business relationships, the plaintiff must establish the following elements:

(1)     there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party;
(2)     the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct;
(3)     the defendant's conduct was independently tortious or unlawful;
(4)     the interference proximately caused the plaintiff injury; and
(5)     the plaintiff suffered actual damage or loss as a result.

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013), *reh'g denied*, Feb. 14, 2014. Regarding the third element, courts require that the plaintiff "prove that

the defendant's conduct would be actionable under a recognized tort," not "that the plaintiff must be able to prove an independent tort." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001). Emerald City asserts the underlying tort of misappropriation of trade secrets, based on Kahn's use of confidential information to contact customers. This is a common law tort under Texas law. *Nova Consulting Grp., Inc. v. Eng'g Consulting Servs., Ltd.*, No. CIV. SA03CA305FB, 2005 WL 2708811, at *23 (W.D. Tex. June 3, 2005).

<u>Whether Kahn & Co. Tortuously Interfered With a Prospective Business Relations With Komen is a Question of Fact.</u>

There is evidence that Emerald City had a reasonable probability of entering into business relationships with Komen and that Kahn acted to prevent it (element one). Komen employee Ms. Hayes e-mailed both Doug Morris at Emerald City and Kahn (through the "booking@downtownfever.com" e-mail address) about having Downtown Fever perform "again" (Dkt. #127-8 at 67). According to Ms. Hayes, Kahn replied to this e-mail by saying that "Downtown Fever" was no longer in business (Dkt. #127-8 at p. 69). Based on Komen's communication, there is a probability that she would have entered into a business relationship with Emerald City.

Kahn must have known that Emerald City could not book the event after Komen booked with him. There is therefore a fact issue regarding the second element. There is also evidence that the conduct was independently tortious (element three). This is because Kahn was able to access the Emerald City e-mail system through his use of passwords, which, as previously noted, constitute a trade secret in this case.

Komen booked its event with Kahn rather than Emerald City (Dkt. #127-8 at pp. 69–70). This is evidence that Kahn proximately caused injury (element four). It follows that Emerald City suffered actual damages (element five). Emerald City, then, has provided sufficient

evidence to raise a fact question regarding each of the elements of a claim for tortious interference with prospective business relations.

<u>Whether Kahn & Co. Tortuously Interfered With a Prospective Business Relations With Diehl and My Possibilities is a Question of Fact.</u>

There is evidence that Emerald City had a reasonable probability of entering into business relationships with Diehl and My Possibilities (element one). During the first preliminary injunction hearing, Kahn testified that he had booked performances with individuals who had solicited him to perform events (Dkt. #56 at 101:7–11), and that one such individual was My Possibilities (Dkt. #56 at 103:6–16). Mr. Taglioi testified that the Diehl booking occurred because a wedding planner who had previously booked with Emerald City called Kahn (Dkt. #127-8 at 60:11–18). Taking all inferences in favor of Emerald City, these callers could have contacted Kahn because they wanted to book with Emerald City's Downtown Fever band, which raises a fact issue as to whether Emerald City had a reasonable probability of entering into business relationships with them.

Kahn must have known that Emerald City could not book these events after Diehl and My Possibilities booked with him. There is therefore a fact issue regarding the second element. Regarding the "independently tortious conduct" element, there is testimony that Kahn used Emerald City's passwords to redirect web traffic from Emerald City's website to a new website displaying Kahn's phone number. Taking all inferences in favor of Emerald City, it is reasonable that Diehl's wedding planner who had worked with Emerald City in the past and then later said she was confused about the bands, would have booked with Emerald City had Kahn not interfered with Emerald City's website and other social media (Dkt. #127-U at p. 76). Likewise, My Possibilities was an existing client that communicated with Emerald City even after Kahn resigned (Dkt. #127-4 at p. 103); Dkt. #127-U at p. 81). This raises a fact issue as to

whether the contracts were procured through misappropriation of trade secrets, which is independently tortious conduct.

Diehl and My Possibilities booked their events with Kahn rather than Emerald City (Dkt. #127-8 at pp. 12, 59). This is evidence that Kahn proximately caused injury (element four). It follows that Emerald City suffered actual damages (element five). Emerald City, then, has provided sufficient evidence to raise a fact question regarding each of the elements in a claim for tortious interference with prospective business relations.

**Conversion**

Emerald City alleges that Kahn has converted "Timbale's [paired cylindrical drums], case for the Timbale's, a wireless system for Vintage Mic – Senheiser Wireless System, Sub Covers, Black table Cloths, Music Tracks . . ., [and] Public Address sound system" (collectively, "physical property") (Dkt. #81 at ¶ 19). Additionally, Emerald City alleges conversion of a copy of Emerald City's "Filemaker" database, which contains Emerald City's customer list, and music tracks (Dkt. #127 at pp. 27–28). Emerald City states that it has requested the return of this property but has not gotten it back (Dkt. #127 at pp. 27–28).

Under Texas law, the elements of conversion are: "(1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant, unlawfully and without authorization, assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights; (3) the plaintiff made a demand for the property; and (4) the defendant refused to return the property." *Wells Fargo Bank Nw., N.A. v. RPK Capital XVI, L.L.C.*, 360 S.W.3d 691, 699 (Tex. App.—Dallas 2012, no pet.).

There Is a Fact Issue Regarding Kahn & Co.'s Alleged Conversion of Emerald City's Physical Property.

Kahn & Co. do not dispute the second or fourth elements for a claim of conversion. Regarding the first element, Emerald City's evidence is sufficient to raise a fact issue regarding ownership of the physical property at issue. There is testimony from Taglioli that Emerald City owned property that was taken by Kahn (Dkt. #127-3 at p. 5).[15]

Regarding the third element, Taglioli's first affidavit provides evidence that a demand for the physical property was made before the filing of the suit. *See* (Dkt. #127-3 at p. 5) ("Emerald City Management has asked [Mr.] Kahn to return these items but, as of the date of this affidavit, he has failed to do so."). At trial, Emerald City could prevail on these facts, and therefore, Kahn & Co. are not entitled to summary judgment.

There is a Fact Issue Regarding Kahn & Co.'s Conversion of Emerald City's Customer List.

Kahn & Co. argue that Emerald City cannot establish the elements for a claim of conversion of the Customer List because it is intangible and because Emerald City still has possession of the Customer List.[16] However, while the Customer List does constitute intangible personal property, Kahn may still be liable because he copied them. *See* 15 Tex. Jur. 3d Conversion § 26 (although conversion claims normally do not apply to intangible personal property, an exception exists where the underlying intangible right has been merged into a document and that document has been converted. Under this so-called "merger exception," Texas courts have recognized conversion claims involving intangible personal property, such as confidential customer lists).

---

[15] Kahn & Co. also argue that the PA system was a gift from Taglioli. However, Emerald City has presented evidence asserting that the PA system was not a gift (Dkt. #127-8 at 107:23-24). Therefore, the ownership of the PA system is a question of fact.

[16] Kahn & Co. also argue that the Customer List is not a "trade secret." However, as discussed above, customer lists can be trade secrets as a matter of law, and whether this particular customer list qualifies is a question of fact.

Furthermore, the fact that Emerald City is still in possession of the original Customer List does not defeat a conversion claim because Emerald City has presented evidence that Kahn copied and used them (Dkt. #127-E at p. 102). Kahn's copying of those items constitutes conversion, since it deprived Emerald City of the exclusive use of the information contained in those items. *See Deaton v. United Mobile Networks, L.P.*, 926 S.W.2d 756 (Tex. App. – Texarkana 1996), *aff'd in part, rev'd in part on other grounds*, 939 S.W.2d 146 (Tex. 1997); *Norton v. Assisted Living Concepts, Inc.*, 786 F. Supp. 2d 1173, 1182 (E.D. Tex. 2011).

<u>Emerald City's Claim of Conversion of Music Tracks Is Preempted by the Copyright Act.</u>

While there may be a fact issue regarding Kahn & Co.'s conversion of Emerald City's customer list and music tracks, Emerald City's claim of conversion is preempted by the Copyright Act. For a state law claim to be preempted under the Copyright Act, it must satisfy both prongs of the following test:

> First, the claim is examined to determine whether it falls "within the subject matter of copyright" as defined by 17 U.S.C. § 102. And second, "the cause of action is examined to determine if it protects rights that are 'equivalent' to any of the exclusive rights of a federal copyright, as provided in 17 U.S.C. § 106."

*Spear*, 791 F.3d at 594. The Fifth Circuit evaluates the second prong under the "extra element" test. *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 787 (5th Cir. 1999). "This test requires that if one or more qualitatively different elements are required to constitute the state-created cause of action being asserted, then the right granted under state law does not lie within the general scope of copyright, and preemption does not occur." *Carson v. Dynegy, Inc.*, 344 F.3d 456 (5th Cir. 2003) (internal citations and quotations omitted). In *Spear*, the Fifth Circuit held that a state law conversion claim was preempted by the Copyright Act "to the extent that it alleges conversion of intangible 'confidential information' and 'certain trade secrets." *Spear*, 791 F.3d at 594.

The Fifth Circuit has held that a state law claim of conversion is preempted where "the core of [the] state law theor[y] of recover [was] the wrongful copying, distribution, and performance of [a song's] lyrics." *Daboub v. Gibbons*, 42 F.3d 285, 289 (5th Cir. 1995). In doing so, the court stated that the plaintiffs had "failed to allege or produce evidence of any element, such as an invasion of personal rights or a breach of fiduciary duty, which rendered their claims different in kind from copyright infringement." *Id*. (internal citations and quotations omitted). Emerald City's conversion claim is no different than that of *Daboub*, in that Emerald City's conversion claim is essentially based on Kahn's copying of a copyrightable song. The claim of conversion of the music track is therefore equivalent to copyright infringement and preempted by the Copyright Act.

**Civil Theft**

<u>There Is a Fact Issue Regarding Theft of Physical Property.</u>

Under the Texas Theft Liability Act ("TTLA"), a person commits theft if he "unlawfully appropriate[s] property or unlawfully obtain[s] services as described by Section 31.03 [or] 31.05" of the Texas Penal Code. TEX. PEN. CODE ANN. § 134.002(2). Under section 31.03, a person commits theft if he "unlawfully appropriates property with intent to deprive the owner of property" without "the owner's effective consent." TEX. PEN. CODE ANN. § 31.03(a)–(b). "Deprive" means "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." TEX. PEN. CODE ANN. § 31.01(2)(A).

As already discussed, there is a fact issue as to whether Emerald City owned the physical property at issue. The fact that Emerald City has requested that the property be returned suggests that Kahn no longer has the owner's consent to use it. The fact that the property has not yet been returned raises a fact issue as to whether Kahn has an intent to deprive Emerald City of the

property.  For these reasons, Emerald City has raised a fact issue regarding the civil theft of property.

<u>Kahn & Co.'s Civil Theft of Emerald City's Music Tracks is Preempted.</u>

For a state law claim to be preempted under the Copyright Act, it must satisfy both prongs of the following test:

> First, the claim is examined to determine whether it falls "within the subject matter of copyright" as defined by 17 U.S.C. § 102.  And second, "the cause of action is examined to determine if it protects rights that are 'equivalent' to any of the exclusive rights of a federal copyright, as provided in 17 U.S.C. § 106."

*Spear*, 791 F.3d at 594.  The Fifth Circuit evaluates the second prong under the "extra element" test.  *Alcatel*, 166 F.3d at 787.  "This test requires that if one or more qualitatively different elements are required to constitute the state-created cause of action being asserted, then the right granted under state law does not lie within the general scope of copyright, and preemption does not occur."  *Carson*, 344 F.3d at 456 (internal citations and quotations omitted).

In *Spear*, the court held that a state law claim under the TTLA was preempted by the Copyright Act, even though copyright infringement does not contain a mens rea requirement like the TTLA.  *Spear*, 791 F.3d at 598.  This was because "elements of knowledge do not establish an element that is qualitatively different from a copyright infringement claim."  *Id.* (internal citations and quotations omitted).  Emerald City's TTLA claim is similar to *Spear*.  Therefore, the claim regarding civil conversion of music tracks is therefore equivalent to copyright infringement and preempted by the Copyright Act.

<u>A Fact Issue Exists Regarding Whether the Customer List is Subject to a Civil Theft Claim.</u>

Civil theft of a trade secret occurs where a person, without the owner's effective consent, knowingly: "1) steals a trade secret, 2) makes a copy of an article representing a trade secret, or 3) communicates or transmits a trade secret."  TEX. PEN. CODE ANN. § 31.05(b)(1)–(3).  Kahn

argues that Emerald City has failed to establish any of the elements of a civil theft claim. However, Emerald City has set out evidence pertaining to each element. Therefore, this claim is appropriate for a jury to consider.

First, Emerald City set forth proof that it has a possessory right to the customer list because it owns the property. Second, Kahn resigned on May 28, 2014. He still has not returned any of the property, and has refused to do so (Dkt. #127 at pp. 27–28). This constitutes evidence that Kahn intends to deprive Emerald City of its property permanently, or for an extended period of time. Third, Emerald City alleges that Kahn made copies of "Filemaker" the program within which it stored the customer list. This constitutes civil theft. *See Wellogix, Inc. v. Accenture*, *LLP*, 788 F. Supp. 2d 523, 542-43 (S.D. Tex. 2011) (Plaintiff may establish theft of trade secrets by showing that without consent the Defendant stole Plaintiff's trade secret, made a copy of an article representing the trade secret, or communicated or transmitted a trade secret) (citing Tex. Penal Code § 31.05). Therefore, whether or not Kahn committed civil theft is a question of fact.

**Conspiracy**

The first element of a claim of conspiracy is a combination of "two or more persons." *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). Texas courts have held that one person acting alone cannot be held liable for civil conspiracy. *Barber v. State*, 764 S.W.2d 232, 234 (Tex. Crim. App. 1988) (citing *Barbier v. Barry*, 345 S.W.2d 557 (Tex. Civ. App.—Dallas 1961, no writ)).

All evidence in the case indicates that Kahn worked alone in his alleged acts of misappropriating trade secrets and taking physical property. Emerald City has not listed a second person who was involved in these acts, as required for a conspiracy under Texas law. Emerald City cannot prevail on a claim of conspiracy as a matter of law because they have not shown any evidence that Kahn was working with or for anyone other than himself and his

corporation.  "A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation."  Thus, a corporate agent cannot conspire with a corporation, unless there is proof they were acting outside of their corporate capacity for a personal purpose.  *See id.* (affirming a district court's grant of summary judgment because there was no evidence that the individual defendants acted outside of their employment capacity); *Fojtik v. First Nat'l Bank of Beeville*, 752 S.W.2d 669, 673 (Tex. App.—Corpus Christi 1988, pet. denied) (individual may conspire with corporation if actions were not in capacity as a corporate agent, but were for personal purposes such as a different business interest).  Therefore, to prove Jordan Kahn conspired with his company, Emerald City must show he acted for a specific personal purpose in furtherance of the alleged conspiracy. Therefore is no fact issue regarding a conspiracy, and Kahn & Co. are entitled to summary judgment on this claim.

**Attorney's Fees**

Emerald City lists attorney's fees as an independent count and in its prayer for relief.  As attorney's fees are a form of relief, not an independent cause of action, the court will grant Kahn & Co.'s Motion for Summary Judgment as to this claim.  *See Carroll Co. v. Sherwin-Williams Co.*, 848 F. Supp. 2d 557, 570 (D. Md. 2012); *Singer v. Nev. ex rel. Dept. of Transp.*, No. 3:09-CV-0696-LRH-RAM, 2011 WL 1627117, at *2 n.2 (D. Nev. Apr. 27, 2011).  This holding does not preclude the possibility of recovery of attorney's fees at trial.  It merely precludes the recovery of attorney's fees as a standalone action.

**Misrepresentation/Fraud**

Kahn & Co. have raised a fact issue as to their counterclaim of fraudulent inducement. Under Texas law, the elements of fraud are:

> (1) a material misrepresentation; (2) that is false; (3) when the defendant made the representation, the defendant knew it was false or made the statement without any knowledge of its truth; (4) the defendant intended the plaintiff to rely on the representation, and the plaintiff actually relied on the representation; and (5) the defendant's actions caused an injury.

*Kevin M. Ehringer Enters., Inc. v. McData Servs. Corp.*, 646 F.3d 321, 325 (5th Cir. 2011) (internal citation omitted). For fraudulent inducement, courts also require proof of an underlying contract. *Id.* Under Texas law, "[f]or a contract to exist, there must be an offer, an acceptance, and valid consideration." *Harco Energy, Inc. v. Re-Entry People, Inc.*, 23 S.W.3d 389, 392 (Tex. App.—Amarillo 2000, no pet.). "To prove that an offer was made, a party must show (1) the offeror intended to make an offer, (2) the terms of the offer were clear and definite, and (3) the offeror communicated the essential terms of the offer to the offeree." *Domingo v. Mitchell*, 257 S.W.3d 34, 39 (Tex. App.—Amarillo 2008, pet. denied). In assessing whether there was an offer and acceptance, courts consider whether there was a "meeting of the minds," defined as "a mutual understanding and assent to the expression of the parties' agreement," which is based on an objective standard. *Domingo v. Mitchell*, 257 S.W.3d 34, 39 (Tex. App.—Amarillo 2008, pet. denied).

<u>Kahn & Co. Have Raised a Fact Question As to All Elements of Contract Formation.</u>

Kahn & Co. have raised a fact issue as to all elements of contract formation.[17]

---

[17] Emerald City claims that Kahn admitted he did not enter into an enforceable contract with Emerald City because Kahn is asserting claims for promissory estoppel and unjust enrichment. However, it is well established that parties may plead inconsistent or alternative theories and no technical form is required. FED. R. CIV. P. 8(d)(1)-(3); see, e.g., *Cessna Aircraft Co. v. Aircraft Network, LLC*, 213 S.W.3d 455, 467 (Tex. App.—Dallas 2006, pet. denied) (a party may plead alternative claims for promissory estoppel and fraud); *see also Laurence v. Atzenhoffer Chevrolet*, 281 F. Supp. 2d 898, 900 (S.D. Tex. 2003) ("Until an action has actually reached the point of entering judgment, Rule 8 allows a plaintiff to explore alternative, mutually exclusive theories."). The court is not persuaded that Kahn's testimony is so inconsistent that it should be disregarded. Emerald City points out that Kahn initially testified that he would have an ownership interest in a business that he and Taglioli would create together, EC Band Inc., but later testified that equity was related to EC Management LLC, which had already been created at the time of the phone conversation (Dkt. #129-1 at 24:2–9, 25:10–19). On summary judgment, the Court will not make this minor inconsistency in testimony, which relates to the identity of two closely-named entities, a basis to exclude Kahn's testimony that a misrepresentation was made.

*Offer*

Kahn & Co. have provided deposition testimony that Taglioli promised Kahn a thirty percent equity interest in EC Management LLC if Kahn would come to Dallas and start a band (Dkt. #129-1 at p. 25:8–25:19). This is evidence of an offer made with clear terms.

Emerald City argues that no misrepresentation could have been made because EC Management LLC, the entity to be formed, was not in existence at the time, and as such could not make an offer or be the subject of the offer (Dkt. #116 at p. 10–11). But Texas courts have held that "an entity not yet incorporated will still be held liable for pre-incorporation acts that are ratified or from which the entity derives benefit." *Tayama v. Riom Corp.*, No. 2:11-CV-167-J, 2012 WL 556007, at *3 (N.D. Tex. Feb. 21, 2012) (quoting *Costal Shutters & Insulation, Inc. v. Derr*, 809 S.W.2d 916, 920 (Tex. App.—Houston [14th Dist.] 1991, no writ)). A jury could find that EC Band Inc. derived benefit from Taglioli's alleged pre-incorporation promise and find for Kahn & Co. under this rule. Therefore, Kahn & Co. have raised a fact issue as to whether a misrepresentation was made.

*Acceptance and Consideration*

Kahn's move to Dallas to work with Taglioli in response to the alleged offer is evidence of acceptance and consideration (Dkt. #129-2 at 24:2-24:9).

*Meeting of the Minds*

For the parties to come to a meeting of the minds, they must agree on all essential terms. *APS Capital Corp. v. Mesa Air Grp., Inc.*, 580 F.3d 265, 272 (5th Cir. 2009). Here, Kahn has produced evidence that the parties came to an agreement regarding the ownership split in the future entity, which is an essential term (Dkt. #129-1 at p. 25:8–25:19). This is sufficient to raise a fact issue as to a meeting of the minds.

Emerald City correctly points out that Kahn testified that there was no agreement as to several terms, including salary, incentives, bonuses, profit sharing, percentages of ownership, and classes of ownership (Dkt. #116-2 at 26:17–20). But on summary judgment, every fact is to be construed in favor of the non-movant. Under this standard, Kahn & Co. have produced sufficient evidence to raise a fact issue regarding a meeting of the minds.

Kahn & Co. Have Raised a Fact Issue Regarding the Elements of Fraud.

*Material Misrepresentation That Was False*

Kahn & Co. have provided deposition testimony that Taglioli promised Kahn a 30% equity interest in EC Management LLC if Kahn would come to Dallas and start a band there (Dkt. #129-1 at 23:7–24:18). But Taglioli did not do so. Furthermore, Kahn alleges that Taglioli said that Kahn had ownership interest in Emerald City Management (Dkt. #129-4 at 18:2-10). This is evidence of a material misrepresentation that was false.

*Knowledge of Falsity, Taglioli's Intent, and Kahn's Reliance*

On summary judgment, the court is to "view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015). From that posture, the fact that a promise was made by Taglioli but never fulfilled, while Taglioli spoke as if his promise of ownership interest had been fulfilled, raises a fact issue as to whether Taglioli knew of the falsity of his statement, and intended for Kahn to rely on it. Kahn testified that he moved to Dallas is evidence of reliance on Taglioli's promise (Dkt. #129-6 at ¶ 6). Kahn & Co., therefore, have raised a fact issue as to elements 2 through 4.

*Injury*

The fact that Kahn did not receive the ownership interest he was promised is evidence of injury, for which Kahn seeks benefit of the bargain damages (Dkt. #88 at ¶ 81). Texas courts

require that an enforceable contract be in place before a party can recover such damages. *See Bohnsack v. Varco, L.P.*, 668 F.3d 262, 275 (5th Cir. 2012) (citing *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007)) ("Courts have refused to award benefit-of-the-bargain damages in the absence of an enforceable contract."). For reasons already described, Kahn & Co. have raised a fact issue as to the existence of an enforceable contract. It follows that they have also raised a fact issue as to the availability of benefit of the bargain damages.

There Is a Fact Issue as to When Fraud Would Be Discovered, therefore, Kahn & Co.'s Cause of Action Is Not Barred by the Statute of Limitations.

An action for fraud must be brought "not later than four years after the day the cause of action accrues." TEX. CIV. PRAC. & REM. CODE ANN. § 16.004 (West). However, "[t]olling is appropriate when the case involves 'allegations of fraud or fraudulent concealment.'" *Margolies v. Deason*, 464 F.3d 547, 555 (5th Cir. 2006) (citing *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996)). "In such cases, the action does not accrue until the plaintiff knew or in the exercise of reasonable diligence should have known of the wrongful act and resulting injury." *Margolies* 464 F.3d at 555 (citation omitted). This statute of limitations "does not start to run until the fraud is discovered or the exercise of reasonable diligence would discover it." *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015), *reh'g denied* (May 1, 2015). Reasonable diligence is normally an issue of fact. *Id*.

Kahn argues that the statute of limitations should be tolled due to Taglioli's fraudulent concealment. Fraudulent concealment has four elements: "(1) the existence of the underlying tort; (2) the defendant's knowledge of the tort; (3) the defendant's use of deception to conceal the tort; and (4) the plaintiff's reasonable reliance on the deception." *Priester v. JP Morgan Chase Bank, N.A.*, 708 F.3d 667, 676 (5th Cir. 2013) *cert. denied sub nom. Priester v. JP Morgan Chase Bank, N.A.*, 134 S. Ct. 196 (2013) (citing *Holland v. Thompson*, 338 S.W.3d 586, 596

(Tex. App.—El Paso 2010, pet. denied)). "[T]he statute of limitations is an affirmative defense that 'places the burden of proof on the party pleading it.'" *Frame v. City of Arlington*, 657 F.3d 215, 239 (5th Cir. 2011) (citing *F.T.C. v. Nat'l Bus. Consultants, Inc.*, 376 F.3d 317, 322 (5th Cir.2004); *In re Hinsley*, 201 F.3d 638, 644–45 (5th Cir. 2000).

Taking Kahn's testimony as true, Taglioli made a misrepresentation in June 2009, when Taglioli promised to give Kahn an ownership interest in EC Management LLC (Dkt. #129-1 at 23:7–24:18). Based on this date, Emerald City and Taglioli argue that the latest Kahn & Co. could have alleged fraud would have been June 2013, well before June 13, 2014, when Kahn & Co. first alleged fraud in their Original Answer (Dkt. #14 at p. 17). There is some evidence that Kahn and Taglioli were continuing to 'negotiate' as late as February 12, 2011, which would place the fraud counterclaim within the statute of limitations (Dkt. #116-5). Kahn asserts that these communications from Taglioli were "leading [Kahn] on through representations and promises" (Dkt. #88 at ¶ 78) and presents evidence to support this contention (Dkt. #129-4 at 18:2-10). This creates a fact issue as to when Kahn could have discovered the fraud through the exercise of reasonable diligence.[18]

**Misappropriation of Trade Secrets**

Emerald City and Taglioli deny that they misappropriated any trade secrets belonging to Kahn & Co. (Dkt. #90 at ¶¶ 82–84). Kahn & Co. did not respond to Emerald City and Taglioli's Motion for Summary Judgment regarding this claim.

Because the alleged misappropriation occurred after September 1, 2013, the Texas Uniform Trade Secrets Act ("TUTSA") applies. *See* Adoption of Uniform Trade Secrets Act,

---

[18] Emerald City argues that Kahn & Co. cannot assert that fraudulent concealment tolled the statute of limitations because fraudulent concealment is an affirmative defense that must be plead and proven by the party asserting it (Dkt. #120 at p. 14). However, the Fifth Circuit has found that a party meets its pleading burden when they have pleaded "sufficient facts to put the defense on notice of the theories on which the complaint is based." *Colonial Penn Ins. Co. v. Mkt. Planners Ins. Agency, Inc.*, 1 F.3d 374, 376 (5th Cir. 1993). The Court finds that Kahn & Co. pleaded sufficient facts to put Emerald City on notice (Dkt. #88 at ¶¶ 70-80).

2013 Tex. Sess. Law Serv. Ch. 10 (S.B. 953) ("The change in law made by this Act applies to the misappropriation of a trade secret made on or after the effective date [September 1, 2013] of this Act."). Under the TUTSA, misappropriation is defined as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent [by one of three classes of individuals]." Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(3)(B).

As no response has been filed, the Court will accept as true Emerald City and Taglioli's statement that it did not misappropriate trade secrets from Kahn & Co. *See Eversley*, 843 F.2d at 174. The Court can also assume that Kahn & Co. have no opposition to summary judgment regarding this claim. *See* Local Rule CV-7(d). Furthermore, Kahn & Co. have provided no evidence that a trade secret was acquired or disclosed by Emerald City, as required for misappropriation under the TUTSA. There is no issue of fact regarding this claim and Emerald City and Taglioli are entitled to summary judgment.

**Declaratory Relief Under the Texas Civil Practice and Remedies Code**

Kahn & Co. seek relief under the Texas Uniform Declaratory Judgment Act ("TUDJA"), § 37.009 of the Texas Civil Practice and Remedies Code (Dkt. #88 at ¶ 97). The Fifth Circuit has held that the TUDJA is a procedural statute that does not apply in federal court under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). *Camacho v. Tex. Workforce Comm'n*, 445 F.3d 407, 413 (5th Cir. 2006). Kahn & Co. have provided no case law to the contrary, and have not responded to Emerald City and Taglioli's Motion for Summary Judgment regarding this claim. As no response has been filed, the Court will assume that Kahn & Co. have no opposition to summary judgment regarding this claim. *See* L.R. CV-7(d). There is therefore no genuine issue of fact regarding this claim, and Emerald City and Taglioli are entitled to summary judgment.

## Promissory Estoppel

Kahn & Co. claim that even if the agreement Kahn established with Taglioli is not enforceable, they deserve reliance damages under a theory of promissory estoppel. The elements of promissory estoppel are: (1) a promise; (2) foreseeable and actual reliance on the promise to one's detriment; (3) that enforcement of the promise be necessary to avoid an injustice, and (4) reliance damages. *See, e.g., Fretz Constr. Co. v. S. Nat'l Bank*, 626 S.W.2d 478, 483 (Tex. 1981). Only when the promise is definite and may be reasonably relied upon by the promisee is a promissory estoppel claim viable. *Gilmartin v. KVTV-Channel 13*, 985 S.W.2d 553, 558-559 (Tex. App. - San Antonio 1998, no pet.).

Kahn presents evidence for each of the elements of promissory estoppel. As discussed above, Kahn presents evidence that Taglioli promised partial ownership of the company (element one) in exchange for Kahn coming and working with Taglioli in Texas (element two). Kahn also presents evidence that he moved to Texas in reliance on this promise, and that he is thus entitled to reliance damages he incurred by working for Taglioli on belief that he would be given an ownership interest (Dkt. #129-6 at ¶ 6). As discussed in the Court's analysis of fraudulent inducement, Kahn has presented evidence that there was a promise (element one), that Kahn relied upon that promise to his detriment (element two). Kahn suffered reliance damages in moving to Texas (element four) (Dkt. #129-4 at 51:16-51:24). Therefore, drawing all reasonable inferences in favor of Kahn and Co., enforcement of the promise, may be necessary to avoid an injustice.[19]

---

[19] Emerald City argues that Kahn and Co. should be precluded from arguing that they are entitled to promissory estoppel and unjust enrichment if they are also claiming fraud in the inducement. This however, is an incorrect statement of law. FED. R. CIV. P. 8(d)(1)-(3); *see, e.g., Cessna Aircraft Co. v. Aircraft Network, LLC*, 213 S.W.3d 455, 467 (Tex. App.—Dallas 2006, pet. denied) (a party may plead alternative claims for promissory estoppel and fraud); *see also Laurence v. Atzenhoffer Chevrolet*, 281 F. Supp. 2d 898, 900 (S.D. Tex. 2003) ("Until an action has actually reached the point of entering judgment, Rule 8 allows a plaintiff to explore alternative, mutually exclusive theories.").

Kahn is not barred by the statute of limitations as set forth above.  Kahn is also not barred by the statute of frauds because the statute of frauds is an affirmative defense that must be affirmatively asserted or it is waived.  *See, e.g.,* FED. R. CIV. P. 8(c); *First Nat'l Bank v. Zimmerman*, 442 S.W.2d 674, 677 (Tex. 1969).  Kahn waived the affirmative defense of the statute of frauds.  Therefore, whether or not Kahn is entitled to prevail in his claim of promissory estoppel is a question of fact for a jury to determine.

The statute of limitations for a claim of promissory estoppel is four years.  *E.g.*, *Prestige Ford Garland Ltd. P'ship v. Morales*, 336 S.W.3d 833, 836 (Tex. App.—Dallas 2011, no pet.) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 16.051).  "[A] promissory estoppel cause of action accrues when the promisor breaches its promise to the promisee."  *Id*. at 837.  "The question of when a cause of action accrues is generally one of law for the courts to determine."  *Id*.

Taking Kahn's testimony as true, in June 2009, Taglioli promised that he would make Kahn a part-owner in EC Management LLC if Kahn would come down and work with him (Dkt. #129-1 at 23:7–24:18).  Kahn began to work for Taglioli in September 2009, but was never made a co-owner.  However, there is evidence that Taglioli said that Kahn was an owner while the Emerald City version of Downtown Fever was performing in Texas (Dkt. 129-4 at 18:2-10); *see Berkley v. Am. Cyanamid Co.*, 799 F.2d 995, 999 (5th Cir. 1986) ("Repeated assurances of the truth of an original representation may constitute an affirmative concealment of the fraud and excuse a failure to exercise diligence in discovering the falsity thereof.") (internal citations omitted).  Furthermore, there is no evidence that Kahn was aware that Taglioli had formed ECM before June 13, 2010.  Therefore, for the same reasons that it is a question of fact whether fraudulent concealment tolls the statute of limitations for fraudulent inducement, it is a question

of fact whether fraudulent concealment also tolled the statute of limitations on Kahn's claim of promissory estoppel.

**Breach of Licensing Agreement**

The elements of breach of licensing agreement are: (1) the existence of a valid contract; (2) performance or tendered performance; (3) breach of the contract, and (4) resulting damages. *See Paramount Pictures Corp. v. Johnson Broad. Inc.*, No. CIV.A.H 04 03488, 2006 WL 367874, *5 (S.D. Tex. Feb. 15, 2006). As discussed in Section above, there is evidence of every element of valid contract formation, and thus, existence of a contract is a question of fact. Furthermore, there is evidence of damages because Kahn did not receive the compensation that he alleges he was promised (Dkt. #116-15). Therefore, whether or not there was a breach of the licensing agreement is a question of fact.

**Unjust Enrichment**

Kahn & Co. claim that Emerald City and Taglioli were unjustly enriched "through their wrongful, improper, unjust, fraudulent, and unfair conduct" associated with "the use of Kahn's [DOWNTOWN FEVER] mark." (Dkt. #88 at ¶ 86). A person is unjustly enriched when he obtains a "benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). In the present case this is a fact issue because, as explained above, whether or not there was fraud is a question of fact. If there was fraud, there is evidence that Emerald City has been unjustly enriched by their continued use of the DOWNTOWN FEVER mark. Emerald City is thus not entitled to summary judgment on this counterclaim.[20]

---

[20] Emerald City argues that the Statute of Limitations bars a claim of unjust enrichment. However, as discussed previously, Emerald City has not met is burden of establishing when Kahn's unjust enrichment claim accrued because Kahn argues that fraudulent concealment tolled the statute of limitations, which is a question of fact.

## CONCLUSION

The parties have raised cross motions for summary judgment for trademark infringement and unfair competition (Dkt. #116, Dkt. #118). However, the parties have established that the ownership of the DOWNTOWN FEVER mark in Texas is a question of fact. It is therefore **ORDERED** that Taglioli and Emerald City's motion for summary judgment regarding Kahn & Co.'s counterclaims of trademark infringement and unfair competition (Dkt. #116) is **DENIED**.

It is further **ORDERED** that because Emerald City has raised a fact issue as to ownership of the DOWNTOWN FEVER mark and no other elements are contested, Kahn & Co.'s motion for summary judgment on Emerald City's claims of common law service mark infringement, common law unfair competition, and trademark infringement under the Texas Anti-Dilution Act (Dkt. #118) is **DENIED**.

It if further **ORDERED** that Kahn & Co.'s motion for summary judgment on Emerald City's claim of trademark infringement under the federal Trademark Dilution Revision Act (Dkt. #118) is **GRANTED**.

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment on Emerald City's claim of tortious interference with existing contracts (Dkt. #118) is **DENIED**.

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment on Emerald City's claim of tortious interference with prospective business relationships (Dkt. #118) is **DENIED**.

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment on Emerald City's claim of conversion of Emerald City's physical property and customer list (Dkt. #118) is **DENIED**.

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment on Emerald City's claim of conversion of Emerald City's music tracks (Dkt. #118) is **GRANTED**.

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment on Emerald City's claim of trademark dilution under the Texas Anti-Dilution Act (Dkt. #118) is **DENIED**.

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment on Emerald City's claim of cybersquatting (Dkt. #118) is **DENIED**.

It is further **ORDERED** Emerald City and Taglioli's Motion for Summary Judgment regarding Kahn & Co.'s counterclaim of promissory estoppel (Dkt. #116) is **DENIED.**

It is further **ORDERED** Emerald City and Taglioli's Motion for Summary Judgment regarding Kahn & Co.'s counterclaim of misrepresentation/fraud (Dkt. #116) is **DENIED.**

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment on Emerald City's claim of civil Theft of Trade Secrets under the Texas Theft Liability Act regarding the customer lists (Dkt. #118) is **DENIED**.

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment on Emerald City's claim of civil theft of Trade Secrets under the Texas Theft Liability Act regarding the music tracks (Dkt. #118) is **GRANTED**.

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment on Emerald City's claim of civil theft of physical property under the Texas Theft Liability Act (Dkt. #118) is **DENIED**.

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment on Emerald City's claim of copyright infringement (Dkt. #118) is **DENIED**.

It is further **ORDERED** that Emerald City and Taglioli's Motion for Summary Judgment on Kahn & Co.'s counterclaim of fraudulent registration with the Texas Secretary of State (Dkt. #116) is **DENIED**.

It is further **ORDERED** that Emerald City and Taglioli's Motion for Summary Judgment on Kahn & Co.'s counterclaim of breach of licensing agreement (Dkt. #116) is **DENIED**.

It is further **ORDERED** that Emerald City and Taglioli's Motion for Summary Judgment on Kahn & Co.'s counterclaim of declaratory relief (Dkt. #116) is **GRANTED**.

It is further **ORDERED** that Emerald City and Taglioli's Motion for Summary Judgment on Kahn & Co.'s counterclaim of unjust enrichment (Dkt. #116) is **DENIED**.

It is further **ORDERED** that Emerald City and Taglioli's Motion for Summary Judgment on Kahn & Co.'s counterclaim of misappropriation of trade secrets (Dkt. #116) is **GRANTED**.

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment on Emerald City's claim of misappropriation of trade secrets under the Texas Uniform Trade Secrets Act regarding the passwords (Dkt. #118) is **GRANTED**.

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment on Emerald City's claim of misappropriation of trade secrets under the Texas Uniform Trade Secrets Act regarding the customer list and music tracks (Dkt. #118) is **DENIED**.

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment on Emerald City's claim of conspiracy (Dkt. #118) is **DENIED**.

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment on Emerald City's claim of breach of fiduciary duty (Dkt. #118) is **DENIED**.

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment on Emerald City's claim of copyright infringement (Dkt. #118) is **DENIED**.

It is further **ORDERED** that Kahn & Co.'s Motion for Summary Judgment regarding Emerald City's claims of false advertising (Dkt. #118) is **DENIED**.

It is further **ORDERED** that Kahn & Co.'s Motion Summary Judgment on Emerald

City's claim of attorney's fees (Dkt. #118) is **GRANTED**.  This does not preclude Emerald City

from recovering attorney's fees at trial, as included in their prayer for relief.

**SIGNED this 8th day of January, 2016.**


_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE